## In the Matter of Andrew Frazee.

*Municipal corporations—Validity of ordinance—Regulation of street processions—Penalty for violation of by-law.*

An ordinance of the city of Grand Rapids prohibited any person or persons, association or organizations, from *marching, parading, riding,* or *driving,* in or upon its streets, with *musical instruments, banners, flags, torches,* or *flambeaux,* or while *singing* or *shouting,* without having first obtained the consent of the mayor or common council. Funeral and military processions were excepted, but were required, as also those permitted by the mayor or council, to conform to such directions as the mayor or chief of police might give in relation to the *streets* to be used, and the *portion* thereof to be *occupied,* and the *manner* of such *use.* The following charter powers were invoked in support of the ordinance :

*a—*"To prevent vice and immorality ; to preserve public peace and good order ; to prevent and quell riots, disturbances, and disorderly assemblages."

*b—*"To prevent the cumbering of streets, sidewalks, etc., in any manner whatever."

*c*—"To control, prescribe, and regulate the manner in which the highways, streets, avenues, lanes, alleys, public grounds, and spaces within said city shall be used."

*d*—"To prohibit practices, amusements, and doings in said streets having a tendency to frighten teams and horses, or dangerous to life and property."

*e*—"To prohibit and prevent any riot, rout, disorderly noise, disturbance, or assemblage in the streets, or elsewhere in the city."

*f*—"To provide for maintaining the peace and good government of said city."

The petitioner, a member of the Salvation Army, was arrested for an alleged violation of *this* ordinance, the complaint charging him and other members with *parading* in, upon, and through Canal and Pearl streets, in said city, with *musical* instruments, *banners*, and *flags*, while *singing* and *shouting*, without having first obtained the *consent* of the mayor or common council of the city. The ordinance provided for a fine not exceeding five hundred dollars, and costs of prosecution, and, in default of payment, imprisonment until the fine and costs were paid, not exceeding ninety days. On an application of the petitioner for his release on *habeas corpus*, the Court, in ordering his discharge, laid down the following general propositions :

1. It is not in the *power* of the Legislature to deprive any of the people of the enjoyment of *equal* privileges under the law, or to give cities any *tyrannical* powers. All charters, laws, and regulations, to be *valid* for any purpose, *must* be capable of construction, and must be construed in conformity to constitutional principles, and in harmony with the *general* laws of the land; and any by-law which violates any of the recognized principles of *legal* and *equal* rights is necessarily void so *far* as it does so, and void *entirely* if it cannot be reasonably applied according to its terms.

2. The charter in question, and powers it *assumes* to grant, so far as it is not *plainly* unconstitutional, must be construed as conferring *only* such power over the subjects referred to as will enable the city to *keep order*, and *suppress* mischief, in accordance with the limitations and conditions required by the rights of the people themselves, as secured by the principles of law, which cannot be less careful of *private* rights under a constitution than under the common law.

3. The possible greater tendency of some things to produce danger and disorder in cities than in smaller towns may justify *reasonable* precautionary measures, but nothing further; and no inference can extend beyond the fair scope of powers granted for such a purpose, and no grant of *absolute discretion* to *suppress lawful* action altogether can be granted at all.

4. That which is an *actual* nuisance can be *suppressed* just so far as

it is *noxious*, and its *noxious* character is the *test* of its wrongfulness.   There may be substances, like some explosives, dangerous in cities under *all* circumstances ; but most dangerous things are not so different in cities as to require more than *increased* or *qualified* safeguards, and to suppress things not *absolutely* dangerous, as an easy way of getting rid of the trouble of *regulating* them, is not a process tolerated under free institutions.   *Regulation*, and not *prohibition*, unless under *clear* authority of the charter, and in cases where it is not *oppressive*, is the *extent* of city power.

5.  It has been customary, from time immemorial, in *all* free and *most* civilized countries, for people who are assembled for common purposes to parade together, by day or *reasonable* hours at night, with banners and other paraphernalia, and music of various kinds ; and such demonstrations are among the incidental conditions of city life, and as much to be expected, on *suitable* occasions, as any other public meetings, and not necessarily any more dangerous, but may become so by perversion to bad uses.

6.  It is only when political, religious, social, or other demonstrations create *public* disturbances, or operate as *nuisances*, or create or manifestly threaten some *tangible* public or private mischief, that the law interferes, and *then* because of the evil *done*, or apparently *menaced*, and not because of the sentiments or purposes of the movement, if not otherwise unlawful ; and things absolutely unlawful are not made so by *local* authority, but by *general* law. All may be capable of legal mischief by perversion, or by circumstances ; and it is lawful to provide for dealing with the mischief, but unlawful to go beyond reasonable measures and precautions in anticipating it.   Private liberty, and public tranquillity and security, must both be kept in view.

7.  Religious liberty does not include the right to introduce and carry out every scheme or purpose which persons see fit to claim as part of their religious system.   While there is no legal authority to constrain belief, no one can lawfully stretch his own liberty of action so as to interfere with that of his neighbors, or violate peace and good order.

8.  It is a fundamental condition of all liberty, and necessary to civil society, that all men must exercise their rights in harmony, and must yield to such restrictions as are necessary to produce peace and good order ; and it is not competent to make any exceptions for or against the so-called "Salvation Army," because of its theories regarding practical work.   In law it has the same right, and is subject to the same restrictions, in its public demonstrations, as any secular body or society which uses similar means for drawing attention or creating interest.

9. The by-law in question is *unreasonable*, because it suppresses what is in general perfectly lawful, and leaves the power of *permitting* or *restraining* processions, and their courses, to an *unregulated* official discretion, when the whole matter, if regulated at all, must be by *permanent*, legal provisions, operating *generally* and *impartially*.

10. A charter provision authorizing the common council of a city to prescribe a penalty or forfeiture not *exceeding* a fixed sum is simply putting in words what was implied in all corporate power to pass by-laws at common law, but it can never be maintained, as a proper construction, that the council can, without exercising any discretion itself, turn over this extravagant power to the courts. It has been the general understanding, under the common law, that municipal penalties must be *fixed*, and not *fluctuating*. Without deciding how far a *sliding* scale of penalties is allowable, it is enough to say that no penalty can be sustained that exceeds in amount what is *reasonable*, and that the by-law cannot properly impose any sum, *sliding* or *fixed*, which exceeds that sum. *Grand Rapids v. Hughes*, 15 Mich. 54.

11. No one in his senses could regard a penalty of five hundred dollars for such trivial offenses as most of those covered by this by-law as within any bound of reason. The penalties must be fixed with regard to the offenses, and cannot all be thrown in together, large and small, under the same measure of punishment. If different classes of acts are considered as of different demerit, the by-law should so classify and punish them.

Habeas corpus to determine the legality of the detention of petitioner for violation of an ordinance of the city of Grand Rapids. Heard October 19, 1886. Petitioner discharged on the hearing. Opinion filed October 28, 1886, in which the facts are stated.

*Stone & Hyde,* for petitioner.

*J. W. Ransom,* for respondent.

CAMPBELL, C. J. Petitioner was brought up on *habeas corpus* to determine on the legality of his detention under a complaint and warrant in a proceeding before the police court of Grand Rapids. No point is raised concerning the formality or jurisdiction of the court, if the by-law is valid

under which the complaint was made. We shall, therefore, not pass upon the form of the remedy, as no argument was made except on the by-law.

The complaint was made under a by-law of the city of Grand Rapids, passed on the thirteenth of September, 1886, and which, from the petition, appears to have been published on the twenty-fourth of the same month. The violation of it is alleged to have occurred on the twenty-eighth of September, which seems to have been as soon as it became operative. The by-law in question is entitled "An ordinance to regulate the use of the public streets in the city of Grand Rapids, and to prohibit certain doings therein."

This ordinance consists of five sections, of which the first and fifth are chiefly material in this inquiry.

The first section is as follows:

"No person or persons, association or organizations, shall march, parade, ride, or drive, in or upon or through the public streets of the city of Grand Rapids, with musical instruments, banners, flags, torches, flambeaux, or while singing or shouting, without having first obtained the consent of the mayor or common council of said city; funeral and military processions, however, shall not be subject to the foregoing provisions of this section; but such processions, as well as those having the permit or consent of the mayor or common council, when using the public streets of said city, shall conform to such directions as the mayor or chief of police may give in relation to the streets to be used, and the portion thereof to be occupied by them, and in relation to the manner of such use."

Then follows a clause that nothing in this ordinance shall affect or impair existing ordinances on nuisances, and the use of streets and sidewalks.

Section 2 prohibits breaking up or interfering with funeral processions. Sections 3 and 4 relate to circulating advertising devices.

Section 5 is as follows:

"All persons who shall violate any of the provisions of this ordinance, on conviction thereof, shall be punished by a fine

of not exceeding five hundred dollars, and costs of prosecution; and, in default of the payment thereof, shall be imprisoned in the common jail in the county of Kent, or in any penitentiary, jail, or work-house of said city, at hard labor, until the payment of such fine and costs, but for a period not exceeding ninety days."

The nature of this imprisonment seems to correspond with criminal, rather than with civil, imprisonment; but, as this question was not fully argued, it will not be especially noticed on the present hearing, as the other questions raised are decisive.

The petition for the writ of *habeas corpus* sets out that petitioner and his associates are members of an organization known as the "Salvation Army," which had paraded in Grand Rapids during two years or more, and, on repeated prosecutions for public nuisance, had been acquitted, and that the ordinance in question had followed quite soon after the last acquittal. Various considerations are set up concerning the rights of such bodies which do not become very material, as the case stands on the record.

On the twenty-ninth day of September, 1886, petitioner and several others were arrested for having violated the ordinance on the previous evening. The charge made was that they "did then and there parade in, upon, and through the public streets of the city of Grand Rapids, to wit, Canal street and Pearl street, with musical instruments, banners, and flags, while singing and shouting, without first having obtained the consent of the mayor or common council of the city of Grand Rapids;" contrary to the ordinance before named.

Under the warrant petitioner was arrested, and has since been kept in custody, the trial having been postponed to enable this application to be made.

The validity of sections 1 and 5 of the ordinance is disputed on various grounds,—the former as an unreasonable

63 MICH.—26.

and unlawful interference with the streets, and the latter as unauthorized and oppressive, beyond the power of the city to enforce.

Section 1, as has been seen, while imposing no limits on military and funeral processions, except that it authorizes the mayor or chief of police to confine them to particular streets, gives to those officers unlimited discretion in fixing their route. Other processions cannot move at all, with music and banners, unless authorized by the mayor or council, and, when so authorized, are under the same arbitrary direction, as to route, of the mayor or chief. Funeral processions, and no others, are protected from disturbance.

As the common council only sits at intervals, the power of determining whether processions shall be allowed is left practically within the unlimited discretion of the mayor. Some of the questions argued before us concerning the fifth section had some bearing on the constitutionality of portions of the charter as well as by-laws. So far as section 1 is concerned, it is claimed to be outside of any inference or grant of authority in the charter. That point may be first noticed.

There is no express reference in the charter to the use of streets for processions, and no power is given to license or regulate them, in terms. It contains no reference to the streets beyond such as contemplates that they shall be under municipal oversight in the usual ways, some of which are mentioned. Counsel for the city referred to various powers which they claim cover the ordinance in question. These were the powers—

1. "To prevent vice and immorality; to preserve public peace and good order; to prevent and quell riots, disturbances, and disorderly assemblages."

2. "To prevent the cumbering of streets, sidewalks, etc., in any manner whatever."

3. "To control, prescribe, and regulate the manner in which the highways, streets, avenues, lanes, alleys, public grounds, and spaces within said city shall be used."

4. "To prohibit practices, amusements, and doings in said

streets having a tendency to frighten teams and horses, or dangerous to life and property."

5. "To prohibit and prevent any riot, rout, disorderly noise, disturbance, or assemblage in the streets or elsewhere in said city."

6. "To provide for maintaining the peace and good government of said city."

If the Legislature of the State had the power to subject the people of cities to the uncontrolled and arbitrary will of a common council, and, having such power, had clearly signified their purpose to do so, then it might perhaps be claimed, with some show of reason, that the city of Grand Rapids could do what it pleased under these grants of power. But the rules of legal construction allow no such absurdity. It is not in the power of the Legislature to deprive any of the people of the enjoyment of equal privileges under the law, or to give cities any tyrannical powers. All charters, and all laws and regulations, to be valid for any purpose, must be capable of construction, and must be construed in conformity to constitutional principles, and in harmony with the general laws of the land; and any by-law which violates any of the recognized principles of legal and equal rights is necessarily void so far as it does so, and void entirely if it cannot be reasonably applied according to its terms.

We must therefore construe this charter, and the powers it assumes to grant, so far as it is not plainly unconstitutional, as only conferring such power over the subjects referred to as will enable the city to keep order, and suppress mischief, in accordance with the limitations and conditions required by the rights of the people themselves, as secured by the principles of law, which cannot be less careful of private rights under a constitution than under the common law.

It is quite possible that some things have a greater tendency to produce danger and disorder in the cities than in smaller towns or in rural places. This may justify reasonable precautionary measures, but nothing further; and no

inference can extend beyond the fair scope of powers granted for such a purpose, and no grant of absolute discretion to suppress lawful action altogether can be granted at all. That which is an actual nuisance can be suppressed just so far as it is noxious, and its noxious character is the test of its wrongfulness. There may be substances, like some explosives, which are dangerous in cities under all circumstances, and made dangerous by city conditions; but most dangerous things are not so different in cities as to require more than increased or qualified safeguards, and to suppress things not absolutely dangerous, as an easy way of getting rid of the trouble of regulating them, is not a process tolerated under free institutions. Regulation, and not prohibition, unless under clear authority of the charter, and in cases where it is not oppressive, is the extent of city power.

It has been customary, from time immemorial, in all free countries, and in most civilized countries, for people who are assembled for common purposes to parade together, by day or reasonable hours at night, with banners and other paraphernalia, and with music of various kinds. These processions for political, religious, and social demonstrations are resorted to for the express purpose of keeping up unity of feeling and enthusiasm, and frequently to produce some effect on the public mind by the spectacle of union and numbers. They are a natural product and exponent of common aims, and valuable factors in furthering them. They are only found to any appreciable extent in places having collected inhabitants, for spectators are generally as important as members. They are among the incidental conditions of city life, and are as much to be expected, on suitable occasions, as any other public meetings, and not necessarily any more dangerous.

They are, however, capable of perversion to bad uses, and, when so perverted, may be dangerous. When people assemble in riotous mobs, and move for purposes opposed to private

or public security, they become unlawful, and their members and abettors become punishable. These dangers are as well known as the customs themselves are, and are sometimes very great dangers. There may be times and occasions when such assemblies may for a while be dangerous in themselves, because of inflammable conditions among the population. All of these things are as ancient as the law, and are generally within reach of the law, unless the law itself is, for the time, suspended by military necessity. During all this period of public history, cities have existed, and had powers of local administration. But it has never been supposed that they needed, or ought to possess, any repressive power over these movements which was not subservient and subsidiary to the general legal scheme of government.

It is only when political, religious, social, or other demonstrations create public disturbances, or operate as nuisances, or create or manifestly threaten some tangible public or private mischief, that the law interferes. And, when it interferes, it does so because of the evil done, or apparently menaced, and not because of the sentiments or purposes of the movement, if not otherwise unlawful; and things absolutely unlawful are not made so by local authority, but by general law. All may be capable of legal mischief by perversion, or by circumstances. It is lawful to provide for dealing with the mischief, but it is not lawful to go beyond reasonable measures and precautions in anticipating it. Private liberty, and public tranquillity and security, must both be kept in view.

We cannot accede to the suggestion that religious liberty includes the right to introduce and carry out every scheme or purpose which persons see fit to claim as part of their religious system. There is no legal authority to constrain belief, but no one can lawfully stretch his own liberty of action so as to interfere with that of his neighbors, or violate peace and good order. The whole criminal law might be practi-

cally superseded if, under pretext of liberty of conscience, the commission of crime is made a religious dogma. It is a fundamental condition of all liberty, and necessary to civil society, that all men must exercise their rights in harmony, and must yield to such restrictions as are necessary to produce that result. It is not competent to make any exceptions either for or against the body of which petitioner is a member, because of its theories concerning practical work. In law it has the same right, and is subject to the same restrictions, in its public demonstrations, as any secular body or society which uses similar means for drawing attention or creating interest.

Whatever regulation is made must operate uniformly, under the same conditions. It is competent to hold all persons liable for any actual wrong done which creates dangerous or noxious consequences. That is already provided for under the law of nuisances. These processions might, no doubt, become nuisances, as any others might do so, but it cannot be assumed that they will; and it appears in the record before us that they have been judicially adjudged otherwise, when prosecuted. Any doctrine that would hold them legally objectionable in themselves would cover every military or political or society procession that ever assumed respectable proportions. All by-laws made to regulate them must fix the conditions expressly and intelligibly, and not leave them to the caprice of any one. This doctrine, as applied to public officers, was recognized in *Horn v. People,* 26 Mich. 221. It is quite as applicable to the common council, acting by resolution on particular cases. The law must be impartial and general, or it is no law. *Waite v. Local Board of Garston,* 3 Q. B. L. R. 5. It is only where power is given to license that permissive action can be left to particular cases. If this were allowed in the case of processions, it would enable a mayor or council to shut off processions of those whose notions did not suit their views or tastes, in politics or religion,

or any other matter on which men differ. When men in authority have arbitrary power, there can be no liberty.

It has never been found wise, and it is not legally reasonable, to do more than fix such general conditions as are necessary to the good order of the community. All persons who resort to cities must accept the inconveniences with the benefits which attend such communities. Those things which must be expected must be endured, if they are within bounds of propriety. *Gilbert v. Showerman*, 23 Mich. 448. It is not unusual to confine noisy doings to such hours of the day and night as will not grossly disturb the quiet rest of sleep. It has been held, with reason, that a moving crowd may be less obnoxious than a stationary one; and this was said, in substance, when a defendant, who drew crowds to his windows by libelous pictures, and thereby blocked up a highway, undertook to justify himself by the processions of the judges and lord mayor. The remarks of Mr. Justice Park on the subject of crowds which may or may not be nuisances, in *Rex v. Carlile*, 6 Car. & P. 636, are quite instructive on this head.

Instances might also be suggested of the propriety of suspending noisy demonstrations at particular times or places, or where they would disturb public assemblies, or invalids, or where, for special and peculiar reasons, regulation is needed. It would not be wise to attempt any definition in advance of these things. The legal rule that by-laws must be reasonable is perhaps as definite as it can be made with safety.

This by-law is unreasonable, because it suppresses what is in general perfectly lawful, and because it leaves the power of permitting or restraining processions, and their courses, to an unregulated official discretion, when the whole matter, if regulated at all, must be by permanent, legal provisions, operating generally and impartially.

It is also objected to the fifth section of the by-law that it gives to the judge who tries the case a discretion in fixing

the penalty up to the highest limit allowed for any purpose by the charter, instead of exercising the duty of fixing it absolutely, or within certain bounds, by provisions of by-law. The charter (title 3, § 14), both as amended in 1885 and as standing previously, declares that, where authority exists to pass ordinances, the common council may prescribe a fine, penalty, or forfeiture not exceeding $500. This is simply putting in words what was implied in all corporate power to pass by-laws at common law. It never can be maintained, as a proper construction, that the council can, without exercising any discretion themselves, turn over this extravagant power to the courts. It has been the general understanding, under the common law, that municipal penalties must be fixed, and not fluctuating. See cases cited in Ang. & A. Corp. § 360. In *Piper v. Chappell*, 14 Mees. & W. 624, the legality of a penality of five pounds, which might be made smaller, but not less than forty shillings, by the corporation officers, was maintained as being really a fixed penalty of five pounds, with power of mitigation by the corporation itself, thus reconciling it with the old authorities. How far a sliding scale of penalties is allowable we need not now consider. These are civil, and not criminal, forfeitures, which, in the absence of other remedies, must be sued for in debt. It has never been customary in our State legislation to leave any discretion in courts upon penalties under highway acts, and others involving no more than violations of legal provisions of a civil nature. It is enough to say that no penalty can be sustained that exceeds in amount what is reasonable, and that the by-law cannot properly impose any sum, sliding or fixed, which exceeds that. See *Grand Rapids v. Hughes*, 15 Mich. 54.

No one in his senses could regard a penalty of $500 for such trivial offenses as most of those covered by this by-law as within any bound of reason. The penalties must be fixed with regard to the offenses. They cannot all be thrown in

together, large and small, under the same measure of punishment. If different classes of acts are considered as of different demerit, the by-law should so classify and punish them. It is probable that no actual abuse has often been committed by the local court in fixing penalties, but, when the law permits, such things are always possible, and, in cases exciting prejudice, are not unlikely to happen. The history of this by-law indicates that the petitioner and his associates have rightly or wrongly become obnoxious to hostile feeling.

As the petitioner was discharged on the hearing, no further order need be entered.

The other Justices concurred.