GUIDONI v. WHEELER, City Jailer.

(First Division. Juneau. · March 18, 1915.)

No. 1239–A.

1. STATUTES ⊚⟶167(1)—REPEALS BY REVISION.

The doctrine that a statute is impliedly repealed by a subsequent statute revising the whole matter of the first does not apply where the revisory statute declares what effect it is intended to have upon the former, as where it provides that it shall repeal all inconsistent or repugnant acts. In such cases only such effect can be given to the revisory acts as it directs. The enumerated acts are repealed; ·the others remain in force.

2. MUNICIPAL CORPORATIONS ⊚⟶625—COURTS—POLICE POWERS.

The defendant was convicted before the police court of Juneau as a vagrant and sentenced to serve a period in the town jail. On habeas corpus to the district court to test the legality of. the conviction and confinement, *held,* the police court of Juneau is a lawful institution. The town has power to pass by-laws and ordinances within the limitations of its powers; but these limitations must be impartial, reasonable, and not oppressive.

3. HABEAS CORPUS ⊚⟶4, 32—APPEAL AND ERROR.

If a town ordinance or by-law is void, no conviction can be sustained under it, and an application in habeas corpus would be the proper method to be pursued by one suffering restraint by reason of a judgment of which it is the basis. If the ordinance is not void, and the person is in restraint because of a defective complaint or insufficient evidence, habeas corpus will not lie, the party's remedy being by appeal or writ of review; for habeas corpus cannot be made to take the place of those remedies.

4. MUNICIPAL CORPORATIONS ⊚⟶120—CONSTRUCTION OF ORDINANCES.

Ordinarily the rigid rules by which the validity of penal statutes are to be tested are not applicable to the by-laws of municipal corporations. The by-laws of very few of these corporations could stand such test. They should receive a reason-

---

⊚⟶See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

able construction, and their terms should not be strictly scrutinized, for the purpose of making them void.

5. MUNICIPAL CORPORATIONS ☜120—CONSTRUCTION.

A town ordinance will be construed according to its reason and spirit. A literal interpretation will be rejected, if such would defeat its purpose. In construction words will sometimes be rejected. Words of an ordinance are construed the same as words of a statute. The legislative intent will control the construction of the word in an ordinance, though the word is inappropriate.

John Rustgard, of Juneau, for plaintiff.
Hellenthal & Hellenthal, of Juneau, for defendant.

JENNINGS, District Judge. The contention is made—

(1) That the city had no power to establish the police court.

(2) That the city had no power to declare what shall be a misdemeanor.

(3) That even if those two positions are not well taken, yet the ordinance is void because it is partial, unreasonable, and oppressive.

As to the first two points: With all due respect to the former judge of the court in the Second division of Alaska, to the effect that the act of 1904 was a repeal of everything contained in the act of 1903, I am constrained to differ from his conclusion.

In 36 Cyc. p. 1081, § 2, it is laid down that the doctrine—

"that a statute is impliedly repealed by a subsequent statute revising the whole matter of the first does not apply, where the revisory statute declares what effect it is intended to have upon the former, as where it provides that it shall repeal all inconsistent or repugnant acts. In such cases only such effect can be given to the revisory acts as it directs. The enumerated acts are repealed; the others remain in force."

And there is a long list of cases cited in support of the text. The court has not examined all of those cases to see if they bear the text out, but it has had occasion quite often to investigate the law on that subject, and is satisfied that the text is well borne out by the authority. But, irrespective of the statute of 1903, the fact that the act of 1904 provides for a police magistrate and gives him jurisdiction of all violations

of city ordinances, and the further fact that vagrancy is a well-recognized subject of municipal regulation would seem to point to the fact that ordinances on such subjects, if otherwise unobjectionable, are valid.

The court has no doubt that the police court is a lawful institution, and it has no doubt that the city can, by proper means, protect itself against vagrants, but that in so doing it must take care that it do not commit a sin against the spirit of liberty and the rights of the citizen cannot be denied.

The city has power to pass by-laws within the limitations of its powers, but those limitations are well known and recognized in the law. They must be impartial, reasonable, and not oppressive.

If this ordinance is void, no conviction based upon it can be sustained, and an application in habeas corpus would be the proper method to be pursued by one suffering restraint by reason of a judgment of which it is the basis. If the ordinance is not void, and the person is in restraint because of a defective complaint or insufficient evidence, habeas corpus will not lie; the party's remedy being by appeal or writ of review, for habeas corpus cannot be made to take the place of those remedies. 3 McQuillin, § 1098.

This much is elementary. That brings us, then, to a determination of the question as to whether or not the ordinance is void.

In the effort to arrive at a correct determination of this question, regard must be had to a variety of conditions and circumstances well established as proper to be taken into consideration, on such an inquiry.

It will hardly be denied that in Juneau there ought to be (if there is not) an enforceable ordinance on the subject of vagrancy. Juneau is a seaport town and is growing rapidly. It is also the center of a rapidly developing mining district, and the population is heterogeneous in the extreme. The town is overrun with people who, in the language of Blackstone, "woke on the night and sleep on the day, and haunt customable taverns and alehouses, and rout about, and no man wot from whence they come ne whither they go." Many willing workers have gathered in the town and the adjacent mining centers, seeking honest employment, and great num·· bers have not been able to find work; but following in the

wake of expanding industry has also appeared a multitude of loafers, idlers, and blood-sucking parasites, who hang upon the flanks of decency and good order with a tenaciousness and destructiveness well-nigh appalling. The population is constantly shifting, and some kind of track and some kind of restraint and supervision are absolutely necessary.

There is some kind of regulation on the subject, and the consideration of such as there is will be approached with a view of making it stand erect, unless it shall be manifest that is must utterly fail of its purpose and be relegated to the limbo of useless junk. So we begin with favorable inclinations towards any ordinance or regulation having for its object the extirpation, diminution, or regulation of the evils under which we suffer.

It is well to bear in mind, too, that:

"Municipal government stands midway between the family and the state. It is an aid to both, and partakes of the nature of both. Police ordinances are at once family rules on a large scale and state laws on a small scale." McRae v. Americus, 59 Ga. 168, 27 Am. Rep. 390.

Also that ordinarily the rigid rules by which the validity of penal statutes are to be tested are not applicable to the by-laws of municipal corporations.

"The by-laws of very few of these corporations could stand such test. They should receive a reasonable construction and their terms should not be strictly scrutinized, for the purpose of making them void." 2 McQuillin, Mun. Corp. § 814.

All doubts are resolved in favor of the validity of the ordinance. The presumption is in favor of the validity, and the burden is upon the one who asserts its invalidity to demonstrate it. Ordinances are to be construed in harmony with the laws and general policy of the state. Id. § 810, p. 1734.

"Whether an ordinance be reasonable and consistent with the law or not is a question for the court, and not for the jury, and evidence to the latter on this subject is inadmissible. But in determining this question the court will have to regard all the circumstances of the particular city or corporation, object sought to be attained, and the necessity which exists for the ordinance. Regulations proper for a large and prosperous city might be absurd or oppressive in a small and sparsely populated town, or in the country." 1 Dillon, Mun. Corp. § 327; C. & A. Ry. Co. v. City, 103 Ill. App. 251.

The ordinance in question denounces as vagrants, and provides for the punishment of, all persons falling within any one of the following descriptions, to wit:

(1) Those persons within the corporate limits of the city of Juneau who have no visible means of living, or lawful occupation or employment by which to earn a living.

(2) Those healthy persons who are found begging means of support.

(3) Those persons who habitually roam about the streets without any lawful business.

(4) Idle or dissolute persons who live in or about houses of ill fame.

(5) Persons having no known occupation or business who shall be found wandering about the streets of the city of Juneau after the hour of 11 o'clock at night.

An ordinance may be valid in some of its provisions and void in others; therefore it is not necessary to consider whether the entire ordinance is void, but only as to whether those portions of it which are pertinent to the case at bar are void. 2 McQuillin, § 816, p. 1743.

The only portions of the ordinance that are pertinent to the case at bar are those involved in the charge which underlies the judgment. That charge is referable only to the first and fifth classes of people mentioned in the ordinance.

The defendant is charged with being a man with no visible means of living, or lawful occupation or employment with which to earn a living. This charge is in the very words of the ordinance. He is also charged with "wandering about the streets of Juneau after the hour of 11 o'clock p. m. without a lawful occupation or business." Supposedly this means to charge a crime under the fifth classification appearing above, to wit, wandering about the streets after the hour of 11 o'clock at night "having no known occupation or business."

We will first consider the first sentence of this ordinance. The language used in that first sentence, to wit, "All persons having no visible means of support or lawful occupation or employment by means of which to earn a living," employs the words which have been used, time out of mind, to describe a vagrant.

And yet even a cursory reflection and analysis is sufficient to demonstrate that not only are those words not sufficient

to describe vagrancy, but also that many individuals, worthy and unfortunate, who are not reprehensible at all, and whom it would be a misnomer, a slander, and a gross injustice to call vagrants, would fall within the strict meaning of said words.

For instance: A person may have a lawful occupation and may have visible means of support, and yet he may be a vagrant on account of the fact that he will not work at his occupation and will not spend his own money to support himself, but prefers to wander around begging, or consorting with disreputables, or seeking whom and what he may devour, and making a general nuisance of himself.

Again: A man having no visible means of support is not necessarily a vagrant. He may have the wealth of Crœsus, and yet that wealth may not be visible. Nor is a man who has no lawful occupation or employment by which to earn the means of living necessarily a vagrant, for he may have plenty of money and yet no occupation. Nor is a man who is without visible means and is also without a lawful occupation or employment necessarily a vagrant, for, as before said, although he have no lawful occupation, and no lawful employment, and no visible means, yet if he have enough invisible means to support himself he could hardly be taken up as a vagrant, if he have no other qualifications, whether he has or has not a lawful occupation or employment.

Again: A man may have no means of support, visible or invisible, and no occupation or employment by which to earn the means of living, and yet not be a vagrant. He may be an honest laborer, out of a job and destitute of means, yet looking for a job and able and willing to work, but unable to find any work to do. Such a man is not, and never has been held to be, a vagrant, and the language used to describe vagrancy has never been held to include him, and yet if the language be strictly construed he would come within its purview.

So it appears the language used is too broad, because it embraces those who may be innocent and worthy, and is too narrow, because it fails to embrace all who come within the spirit of the term vagrant. Nevertheless, such language, although manifestly inapt, has, through all the years, been taken to describe a vagrant. This is because something which is not in the language has always been read into it, so that,

considering as a part of the language what has been read into it, the language itself has come to have an artificial meaning, and that artificial meaning may be expressed thus:

"Whoever is without means of support, or lawful occupation or employment by means of which support can be obtained, and who conducts himself in such a manner as to be a detriment to the peace and order, or offend the sense of decency, or shock the morals, of the community, is a vagrant."

This reading into a statute or an ordinance of things consonant to the spirit, although not found in the letter, is no new thing in construction. It is one of the well-known canons of construction. It is aptly expressed in the good book, "Not of the letter, but of the spirit; for the letter killeth, but the spirit giveth life." And the cases are too numerous to mention where language has been construed to mean what the spirit signifies, and not merely what the language imports. For instance: The language of the national Constitution is that no man shall be convicted of a crime, except by the verdict of a jury. The Congress undertook to say that in Alaska in misdemeanor cases a jury of six was sufficient. A defendant in a misdemeanor case demanded a jury of twelve, and, upon that being denied him, took appeal. The Supreme Court of the United States read into the Constitution the words "a jury of twelve." Rassmussen v. U. S., 197 U. S. 516, 25 Sup. Ct. 514, 49 L. Ed. 862.

The court said, in substance, that what the Constitution makers must have meant was a jury of twelve; that that was the only jury they knew anything about—a common-law jury.

The most notable of recent instances of reading things into the letter of the statute so that the spirit should shine forth, occurs in the opinion of the Supreme Court of the United States in the Standard Oil Case. There the word "unreasonable" was read into the language "combination in restraint of trade, so that it is made to read "combination in unreasonable restraint of trade." This was justified by reason of the fact that in the light of history and past adjudications "restraint of trade" meant unreasonable restraint of trade. As said by the Chief Justice, "Originally all such contracts were considered to be illegal, because it was deemed they were injurious to the public as well as to the individuals who made

them. In the interest of the freedom of individuals to contract, this doctrine was modified so that it was only when a restraint by contract was so general as to be coterminous with the kingdom that it was treated as void. That is to say, if the restraint was partial in its operation and was otherwise reasonable, the contract was held to be void." Therefore, construing it according to the rule of reason and in the light of history and attending circumstances, a statute which in words made unlawful all combinations in restraint of trade, came to mean not all combinations, but only those combinations which were not partial in their operations and which were otherwise reasonable. Here a whole clause was, by the spirit, supplied to the language. Standard Oil Co. v. U. S., 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734.

As further illustrating: A statute of the state of Washington provided that all places "where women are employed to draw custom and to dance" were nuisances and might be abated and the proprietors prosecuted. Now, it is perfectly evident that by a strict literal construction of that statute the promoter of exhibitions wherein Pavlova or Isadora Duncan or Loie Fuller perform, would be in the same category as the keeper of a dance hall, where women are employed to draw customers to the bar to take a drink after each performance. Certainly such was not the intention of the Legislature of the state of Washington. The spirit of the law was to discountenance and discourage only such exhibitions as were carried on in such a way as to shock the morals of the community. The case came up on appeal (not habeas corpus). So the Supreme Court of the state read that meaning into the statute, saying:

"It is further contended by the appellant that the information is fatally defective in not showing that the manner of 'drawing custom' and of dancing, for which the women are alleged to have been employed, was such as to shock the moral sense, or to interfere with the peace and good order of the community, or in any manner whatever to affect the community, or to constitute a nuisance. That portion of the information to which appellant's objection is directed follows the language of the statute, and is consequently sufficient, unless the words used are so general as to include cases not intended by the Legislature to be included in the statute. If, therefore, women may, within the meaning of the statute, in any case lawfully be employed in any place of resort to draw custom or to dance, then

the information should have stated facts showing that this was not one of those cases, notwithstanding the language of the law suggests no exception. It is the intention of the Legislature that is to be determined in the construction of statutes, and in arriving at the intention it is sometimes necessary to restrict the meaning of the language used by the lawmakers so as not to include therein all that the words express. 'It is a familiar canon of construction that the thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter, and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers.' Riggs v. Palmer (N. Y. App.) 115 N. Y. 506, 22 N. E. 189 [5 L. R. A. 340, 12 Am. St. Rep. 819]. It was evidently the object and intention of the Legislature, in passing the statute under consideration, to punish all persons engaged in any business which openly outrages decency and tends to corrupt the public morals, and not to condemn the employing of women, in all cases, even for the purpose of drawing custom and dancing, regardless of the effect thereof upon the community. At common law, all public shows of a scandalous and demoralizing character were nuisances, without regard to whether the persons participating therein were men or women, while theaters and other places of innocent amusement were favorably recognized. Taken literally, the language of our statute would authorize the punishment of all theatrical managers who open their doors, and permit the public to enter and witness the performance of even the greatest of female histrionic or terpsichorean celebrities; yet no one would for a moment consider that such was the intention of the Legislature. * * * We are therefore of the opinion that the information in this case should have gone further, and shown that the character of the women alleged to have been employed, or the manner of their deportment and quality and character of conversation, was such as tended to draw together crowds of disorderly persons, or to debauch the morals of those resorting to the place. Liquor selling is recognized by our law as a legitimate vocation, and we think that even a woman may be employed in a saloon without thereby necessarily rendering the place a 'nuisance,' within the meaning of the statute in question." State v. Brown, 7 Wash. 10, 34 Pac. 132.

Says one author:

"The ordinance will be construed according to its reason and spirit. A literal interpretation will be rejected, if such would defeat its purpose. In construction, words will sometimes be rejected. Words of an ordinance are construed the same as words of a statute. The legislative intent will control the construction of a word in an ordinance, though the word is inappropriate." 2 McQuillin, p. 1741.

And so into this ordinance, words notwithstanding, there must be read the spirit of the law; there must be read the meaning which the words had originally, and which through

long years they have stood for, and what they stand for now; there must be read into it all the tenor of our institutions, the conditions of society, the evils to be remedied, the ends to be accomplished, the general policy and history of the people, all the harmony of the law, and the common sense of our ancestors and of ourselves. There are many Constitutions and statutes and ordinances which, taken literally, lead to glaring absurdities, but which, when read in the light of the spirit, are radiant with justice and benevolence and common sense.

Such an ordinance is this. Reading the spirit, and not the letter, there is no difficulty. The indigent, but unemployed, honest man has nothing to fear from it. It is not aimed in his direction. It never was aimed in his direction. It will not hit him, except by inadvertence. It is true that under it mistakes may sometimes be made and the innocent suffer. But when was this otherwise? At what stage of the world's history was it that human institutions became infallible? In what decade have mistakes not been made? And he who would devise a scheme by which the innocent will never suffer for the sins of others deserves and will receive "a monument more lasting than brass and higher than the royal altitude of the pyramids." Many an innocent man has been hanged for a murder which he never committed. Shall we, on that account, abandon all prosecutions for murder? Many a man has been sent to prison for another man's crime. Shall we, on that account, abolish all the jails?

It is true that under the strict letter of this ordinance an honest workingman may sometimes suffer; but shall we, on that account, give over the city to pimps, macques, harpies, loafers, petty thieves, and leering mashers?

If the ordinance is read according to the strict letter, such an alternative might arise; but if it be read according to its spirit no such dilemma confronts us. Read according to its spirit, the honest man is as safe as he ordinarily is under our necessarily defective institutions, and it is only the parasite and the degenerate who needs slink out of sight at the approach of the officers of the law. Such men, when apprehended, are always the first to invoke those principles of law and liberty which they habitually despise and disregard. Such is "the homage which vice pays to virtue."

All good citizens must take their chances. They have to take them as to all other prosecutions. Each is liable to be arrested on any charge, and to be tried before a jury, to ascertain whether or not he has committed the crime with which he is charged. Sometimes, no doubt, a worthy citizen will be unjustly arrested or convicted under this ordinance; but the ordinance is not, on that account alone, to be held void.

An ordinance may be too comprehensive in its provisions, and cover cases which the city has no power to control; but that is no reason why courts should refuse to enforce it in cases over which the jurisdiction of the local corporation is unquestioned.

An ordinance operating unreasonably and oppressively in particular cases only may be enforced, except in such cases.

An ordinance that may operate reasonably in some instances and unreasonably in others is not wholly void, and will not be set aside in toto. Schwartz Bros. Co. v. Board of Health of Jersey City, 84 N. J. Law, 735, 87 Atl. 463.

The reasonableness is not to be tested by application to extreme cases. Commonwealth v. Cutter, 156 Mass. 52, 29 N. E. 1146; In re Frazee, 63 Mich. 396, 30 N. W. 72, 6 Am. St. Rep. 310.

The court therefore holds that this ordinance is not void. When certain things are shown in evidence, the letter of the ordinance will not apply, because the spirit will kill the letter; in such cases the defendant will not be held to have violated the ordinance and cannot legally be punished. It may be a fact that the petitioner in this case has not violated the ordinance; the court which tried him, however, says that he did. That court heard the evidence. This court cannot, without hearing evidence, say that he did not violate the ordinance. Let him appeal, as he has a right to do. On such an appeal it will be determined whether or not the facts shown in evidence expose him to the sanction of the ordinance as read in letter and spirit.

Petitioner having been charged with doing the things prohibited by that sentence of the ordinance which we have been considering, and having been found guilty, it will be unnecessary to advert to the question as to whether or not he could be held, had he been convicted only under the fifth classification of persons deemed to be vagrants.

Cases have been cited by the learned counsel for petitioner in which convictions have been annulled, when made on ordinances more or less similar to that in question here. In each instance but one the case came up on appeal, and the court decided that, as applied to the evidence in the particular case under consideration there, it would be unconscionable to sustain the conviction because, as so applied, the ordinance was discriminatory, or unreasonable, or oppressive, or open to some other cogent objection appearing in the proceedings. But we have seen that each case stands upon its own footing and that "the reasonableness is not to be tested by application to extreme cases."

Only one of the cases cited by counsel for petitioner was on habeas corpus. That was In re Frasee, supra, the Salvation Army case; and the reason the ordinance in that case was held void was because the common council had delegated to an individual, the mayor, the sole power, the arbitrary power, the unappealable power, to say who should and who should not parade the public street. No rules had been prescribed; the whole matter was left to the whim of one man, and to parade without that one man's permission was a misdemeanor. He could give or withhold his permission as favor, anger, hatred, or caprice dictated. No wonder the writ of habeas corpus was granted.

The application is denied, and the petitioner is remanded to the custody of the city jailer.