DUNCAN v. UNITED STATES. *
No. 6338.

Circuit Court of Appeals, Ninth Circuit.

March 9, 1931.

*Certiorari denied 51 S. Ct. 656, 75 L. Ed. ——.

John A. Jeffrey, of Portland, Or., for appellant.

George Neuner, U. S. Atty., and J. W. McCulloch, Asst. U. S. Atty., both of Portland, Or.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

The appellant was indicted and convicted for a violation of section 29 of the Radio Act of February 23, 1927, 44 Stat. 1172 (47 USCA § 109), and penalty was imposed upon him in pursuance of section 33 of the same act (44 Stat. 1173 [47 USCA § 113]). As .the defendant was acquitted on all the counts of the indictment except count 3, it is only necessary to consider the indictment upon .that count.

The appellant was accused in that count of knowingly, unlawfully, willfully, and feloniously uttering obscene, indecent, and profane language by means of radio communication and by interstate radio transmission from his radio broadcasting station known as KVEP situated in Portland, within the state and district of Oregon. It is alleged that this broadcasting extended beyond the limits of the state of Oregon and reached other states within the United States. The language alleged to have been used is set up in hæc verba in the indictment and occupies over six pages of the transcript. Although the main question in the case, in our view, is as to whether or not this language was obscene or indecent or profane, we think that the question may be disposed of without setting out the highly objectionable language set forth in the indictment. It is undesirable to set forth this language if it can be avoided because of the fact that it charges various crimes against individuals specified which should not be embodied in the published reports.

Preliminarily we must dispose of two points which are urged by the appellant. The appellant's first point is that the act of Congress does not purport to provide a penalty for the use of obscene, indecent, or profane language in a broadcast. Section 29 of the Radio Act provides as follows: "Nothing in this chapter shall be understood or construed to give the licensing authority the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the licensing authority which shall interfere with the right of free speech by means of radio communications. No person within the jurisdiction of the United States shall utter any obscene, indecent, or profane language by means of radio communication."

Section 33 of the same act provides: "Any person, firm, company, or corporation who shall violate any provision of this chapter, * * * upon conviction thereof in any court of competent jurisdiction shall be punished by a fine of not more than $5,000 or by imprisonment for a term of not more than five years or both for each and every such offense."

In view of the fact that the statute expressly prohibits the use of such language in radio broadcasting and expressly imposes a

penalty for violation of the law, we see no ground for appellant's contention made for the first time upon the argument. The statute plainly imposes a punishment for broadcasting obscene, indecent, and profane language.

Appellant's next proposition is that Congress has no power to impose a penalty for the use of such language in broadcasting. It is conceded by the appellant, as it must be, that the conveyance of ideas across the boundaries of the state of origin to other states in the United States is interstate commerce and is analogous to the transmission of such ideas by telephone or telegraph. This, we think, is too plain under well-established principles to require citation of authorities, particularly in view of the concession of the appellant. However, in this connection we call attention to the following decisions without further comment: Pensacola T. Co. v. W. U., 96 U. S. 1, 24 L. Ed. 708; Western Union Teleg. Co. v. Pendleton, 122 U. S. 347, 7 S. Ct. 1126, 30 L. Ed. 1187; International Text-Book Co. v. Pigg, 217 U. S. 91, 30 S. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Railroad Commission of State of Wisconsin v. C., B. & Q., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Whitehurst v. Grimes (D. C.) 21 F. (2d) 787; U. S. v. American B. & M. Co. (D. C.) 31 F. (2d) 448, 452; Gen. Elec. Co. v. Fed. Radio Comm., 58 App. D. C. 386, 31 F. (2d) 630; Technical Laboratory v. Fed. Radio Comm., 36 F. (2d) 111, 112, 66 A. L. R. 1355; City of N. Y. v. Fed. Radio Comm. (App. D. C.) 36 F. (2d) 115. The appellant does not dispute the right of Congress to regulate interstate communication by radio, but his claim is that the prohibition of the use of obscene language over the radio in such interstate commerce is not a regulation of that commerce; that the remedy for such evils is an appeal to the law of the state in which the broadcasting station is situated; that the use of such language is one properly punishable under the police power of the state, and that under the Tenth Amendment to the Constitution of the United States such powers are reserved to the State from the United States. In support of this proposition appellant cites Linder v. U. S., 268 U. S. 5, 45 S. Ct. 446, 69 L. Ed. 819, 39 A. L. R. 229; Daly v. Elton, 195 U. S. 242, 25 S. Ct. 22, 49 L. Ed. 177; U. S. v. De Witt, 9 Wall. 41, 19 L. Ed. 593; U. S. v. Reese, 92 U. S. 214, 23 L. Ed. 563; Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923; Des Moines v. Oil Co., 193 Iowa, 1096, 184 N. W. 823, 188 N. W. 921, 23 A. L. R. 1322; Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Coppage v. Kansas, 236 U. S. 1, 35 S. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960.

The fact that in regulating interstate commerce Congress may exercise police power, which in the absence of delegation of power to the federal government would be exclusively within the police power of the state, is not determinative of the question. The determinative point is whether or not the Constitution does delegate to the United States police power which in the absence of such delegation could only be exercised by the states. It has uniformly been held that the delegation of power to Congress to establish post offices and post roads (Const. art. 1, § 8, cl. 7) authorized Congress to exclude objectionable matter from United States mail. In a discussion of this question the Supreme Court considered the extent of this grant to the Congress of the United States in Re Jackson, 96 U. S. 727, 736, 24 L. Ed. 877. In the opinion upholding the power of Congress, written by Mr. Justice Field, it is said:

"In excluding various articles from the mail, the object of Congress has not been to interfere with the freedom of the press, or with any other rights of the people; but to refuse its facilities for the distribution of matter deemed injurious to the public morals. Thus, by the Act of March 3, 1873 [17 Stat. 599, § 2], Congress declared 'that no obscene, lewd, or lascivious book, pamphlet, picture, paper, print, or other publication of an indecent character, or any article or thing designed or intended for the prevention of conception or procuring of abortion, nor any article or thing intended or adapted for any indecent or immoral use or nature, nor any written or printed card, circular, book, pamphlet, advertisement, or notice of any kind, giving information, directly or indirectly, where, or how, or of whom, or by what means, either of the things before mentioned may be obtained or made, nor any letter upon the envelope of which, or postal-card upon which indecent or scurrilous epithets may be written or printed, shall be carried in the mail; and any person who shall knowingly deposit, or cause to be deposited, for mailing or delivery, any of the hereinbefore mentioned articles or things, * * * shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall, for every offence, be fined not less than $100, nor more than $5,000, or imprisonment at hard labor not less than one year nor more than ten years, or both, in the discretion of the judge.'

"All that Congress meant by this act was,

that the mail should not be used to transport such corrupting publications and articles, and that any one who attempted to use it for that purpose should be punished. The same inhibition has been extended to circulars concerning lotteries,—institutions which are supposed to have a demoralizing influence upon the people."

Later this matter was again considered by the Supreme Court in Re Rapier, 143 U. S. 110, 12 S. Ct. 374, 36 L. Ed. 93, and the power of Congress to exclude lottery matter from the mails was upheld.

The force of these decisions is recognized by the appellant, but he attempts to avoid these authorities by the suggestion that power over the Postoffice Department of the government is greater than the power to regulate interstate commerce in the respects involved in this matter (see Const. art. 1, § 8, cl. 3). It may be conceded that by reason of the fact that Congress has developed a policy of government operation of the mails that the question as to the transportation of obscene matter in the mails is not identical with that involved in the transmission of obscene matter in interstate commerce. We can see no distinction in principle.

The power of Congress under the constitutional grant to regulate commerce between the states has been considered in connection with the so-called White Slave Traffic Act, or Mann Act (36 Stat. 825, c. 395 [18 USCA § 397 et seq.]), prohibiting the transportation of women and girls for immoral purposes in interstate and foreign commerce. This law was sustained by the Supreme Court in Hoke v. U. S., 227 U. S. 308, 33 S. Ct. 281, 283, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905, and in sustaining this law Judge McKenna, speaking for the court, likened the prohibition to that "which prohibits the carrying of obscene literature and articles designed for indecent and immoral use from one state to another. Act of February 8, 1897, 29 Stat. at L. 512, c. 172. U. S. v. Popper [D. C.] 98 F. 423." The case of United States v. Popper thus referred to by the Supreme Court with approval was decided by Judge De Haven in the District Court for the Northern District of California and amply sustains the power of the federal government involved in the case at bar. See, also, Wilson v. U. S., 232 U. S. 563, 34 S. Ct. 347, 58 L. Ed. 728. In Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, involving the constitutionality of the Act of Congress of September 1, 1916 (39 Stat.

675), prohibiting transportation of goods manufactured by child labor under certain conditions, the law was held unconstitutional, but the difference between the question involved in that case and that involved in transportation of impure foods and drugs, lottery tickets, and obscene literature was thus distinguished: "In each of these instances the use of interstate transportation was necessary to the accomplishment of harmful results. In other words, although the power over interstate transportation was to regulate, that could only be accomplished by prohibiting the use of the facilities of interstate commerce to effect the evil intended."

In Clark v. U. S. (C. C. A.) 211 F. 916, section 245 of the Federal Criminal Code (Act of March 4, 1909, c. 321, 35 Stat. 1138, U. S. Comp. St. Supp. 1911, p. 1664 [18 USCA § 396]) was sustained as a constitutional exercise of the power of Congress to regulate interstate commerce. This section of the Criminal Code dealt with the transportation of obscene, lewd, and lascivious literature or other matter of indecent character, and is direct authority upon the right of Congress to prohibit such transportation. It thus appears that the right of Congress to enact such legislation has been thoroughly settled. See Coomer v. U. S. (C. C. A.) 213 F. 1.

In the trial court the appellant appropriately challenged the sufficiency of the indictment, and we have now to consider whether or not the language set forth in the indictment comes under the ban of section 29 of the Radio Act above quoted. Appellant maintains that the language set forth in the indictment as having been used by the defendant in radio broadcasting was neither obscene nor indecent within the meaning of the law. The district attorney, on the other hand, contends that the language is both obscene and indecent. Neither side have discussed the question as to whether or not the language set forth in the indictment was profane within the meaning of the law. Upon this subject the appellant contents himself with the following claim, as stated in his brief: "Language is not obscene, indecent or profane within the legal meaning of those terms, except it is calculated to promote violation of the law and the general corruption of morals. It is determined by the sensibilities and moral standards of a people, as evolved from generation to generation. It changes with the times and civilization."

And, on the other hand, the district attorney asserts in the argument that the taking of the name of the Diety in vain is profane with-

in the meaning of the law. We are satisfied from an examination of the indictment that, while the language used by the appellant is vulgar, scurrilous, and indecent in the popular sense of the term, it is not obscene or indecent within the meaning of those terms as universally applied in the administration of the criminal law with reference to the use of obscene and indecent language. An elaborate discussion of that question we think entirely unnecessary because there is no serious disagreement in the authorities nor between the parties as to the law upon the subject. The test is as to whether or not the language alleged to be obscene would arouse lewd or lascivious thought in the minds of those hearing or reading the publication. As stated by Judge Baker of the United States District Court of Indiana in U. S. v. Males, 51 F. 41, 43: "It seems to me that the statute under consideration was intended to prohibit the dissemination by the mails of printed or written matter or pictorial productions calculated to excite the animal passions, and to corrupt and debauch the mind, and not such as are merely coarse, vulgar, or indecent in the popular sense of those terms." In that case he held that the language used, although coarse, vulgar, and indecent, was not within the purview of the statute because its tendency was to excite anger and condemn and repel rather than excite feelings of an impure, lascivious, or unchaste character. See, also, U. S. v. Clark (D. C.) 43 F. 574; Griffin v. U. S. (C. C. A.) 248 F. 6; Knowles v. U. S. (C. C. A.) 170 F. 409; Dysart v. U. S. (C. C. A.) 4 F.(2d) 765; Krause v. U. S. (C. C. A.) 29 F.(2d) 248. And our own more recent decision in Magon v. U. S., 248 F. 201, 203, where it was said: "In construing the word 'obscene,' as used therein, it has been uniformly held that, if the matter complained of were of such a nature as would tend to corrupt the morals of those whose minds are open to such influences by arousing or implanting in such minds lewd or lascivious thoughts or desires, it is within the prohibition of the statute, and that whether or not it had such tendency was a question for the jury." (Citing numerous cases to which we refer.)

In U. S. v. Davidson, 244 F. 523, 529, the District Court of the Northern District of New York had under consideration a letter charging the addressee with certain immoral conduct. It is said of this letter: "The communication in the instant case is vulgar, abusive, insulting, and one calculated to arouse angry passions and resentment, but not sexual passions or desires." It was held that the letter was not indecent within the meaning of the law.

The statements in the indictment, so far as they are involved in the charges of obscenity and indecency, may be summarized as follows: They charge an individual named as a "grafting thief," a man who would corrupt school teachers by asking them to write letters to the Radio Commission; charging this same individual as being "slick, thieving, grafting, dirty, cowardly," "a grafting scoundrel," a "grafting thief," a "wall-eyed scoundrel," charging the same individual with hiding a "yellow vulture mixed up in the Bizzell case." Again the same individual was characterized as a "doggoned thieving, lying, plundering, doggoned corrupt crook, that goes out here and rams a Carnation Milk contract through the schools, and has the little children of this town a'drinking putrid milk." "Doggone his lousy picture. He's not fit for the penitentiary. He'd disgrace any penitentiary." He refers to another individual as a "sewer rat" and returning to the first individual he thus characterizes him, "He is the lowest of the low, the vilest of the vile, the dirtiest thievin' grafter that ever disgraced the school board in any country." He also calls him a "doggoned old slick witted coward," and a "yellow coward." He denounces certain newspapers in unmeasured terms. He accuses them of receiving money to withhold publication of news with reference to an attempted rape, and of withholding news of a smallpox epidemic. He refers to another individual as the "lowest dirtiest vilest grave robber on the Pacific Coast," and to a number as a "bunch of infamous, despicable thieves and receivers of stolen goods." He states that the newspapers look on in silence while a certain individual "looted the school funds and prostituted the school teachers of this district." The same newspaper is charged with protecting "Sodomites and concealing murder, arson and burglary and waxing rich from the wages of thieves."

It is manifest from the foregoing that the language used, while extremely abusive and objectionable, has no tendency to excite libidinous thoughts on the part of the hearers. If the appellant had been engaged in a crusade to clean up the city and in furtherance of that crusade had confined himself to truthful statements concerning the wrongdoing of public officials, it would hardly be claimed that this rough, abusive, vulgar, and unseemly language was obscene according to the test applied in criminal law. The fact that the ap-

pellant's attack upon public officials grew out of a desire on his part to further the interests of the independent grocery stores does not change the character or effect of the language, and it is conceded that in the case at bar the question of whether or not the statements made by the appellant were true is immaterial. We do not wish to be understood as approving in any degree the language used by the appellant. The question for our consideration is whether Congress has prohibited the use of such language over the radio. We must conclude that the language used is not covered by the statutory prohibition against the use of obscene and indecent language. We will now consider whether or not the language is profane.

▮ In that connection we will examine the following statements: "You're the infernal gang that put in and turned the dairy industry over to that damn scoundrel. * * *" (We omit the name.) "You're a fine example, by God, for the children of this school district." "He will do anything, there's nothing in God Almighty's world that * * * wouldn't do." And, "Wait until I get through some of the trouble you're getting an ex-convict to make for me and I'll put on the mantle of the Lord and call down the curse of God on you, that's what I'll do. You infamous harlot, you arch criminal, the people should tar and feather you and yours," etc.

The question of what constitutes profane language has been before the courts for centuries. The subject is usually dealt with as a branch of the common-law offense of blasphemy, but in the United States particularly it has been a frequent subject of legislation. In the Century Dictionary, "profane" is defined as follows: "Irreverent toward God or holy things; speaking or spoken, acting or acted, in manifest or implied contempt of sacred things; blasphemous: as, profane language; profane swearing." In Gaines v. State, 7 Lea (75 Tenn.) 410, 40 Am. Rep. 64, decided in 1881, the defendant was charged with uttering a profane oath in a public place, etc. It was said: "Any words importing an imprecation of divine vengeance or implying divine condemnation, so used as to constitute a public nuisance, would suffice. Isom v. State, September Term, 1880; Holcomb v. Cornish, 8 Conn. 375."

In Sanford v. State, 91 Miss. 158, 44 So. 801, in dealing with the following language, "Go to hell, you low down devils," the court said: "The language does not violate the statute, since, upon strict construction, which

is required of the courts, it lacks any 'imprecation of divine vengeance' and does not 'imply divine condemnation.' State v. Wiley, 76 Miss. 282, 24 So. 194, 71 Am. St. Rep. 531. There was simply a rude request or order to go to hell. with no necessity to obey, no power to enforce obedience, and no intimation that the irresistible Power had condemned, or was invoked to condemn, them to go to hell."

In a more recent case, City of Georgetown v. Scurry, 90 S. C. 346, 73 S. E. 353, 354, the court said: "It is true that profane language is language irreverent toward God or holy things."

In the case of Roberts v. State, 120 Ga. 177, 47 S. E. 511, the Supreme Court of Georgia in May, 1904, seemed to be of the opinion that the words, "I can whip any damn Groover of the name," was profane language, but remanded the case for a new trial because of erroneous instructions with relation to other language contained in the indictment.

In Holcomb v. Cornish, 8 Conn. 375, decided by the Supreme Court of Connecticut in 1831, defendant was found guilty of the use of profanity in referring to another as a "damned old rascal," and also using the name of the Deity in that connection. The court, speaking through Williams, Justice, in answering the contention that the language used did not constitute profane cursing and swearing, said: "Some of these words, I have no doubt, are clearly within the statute. They are imprecations of future divine vengeance upon the magistrate. Others may be of more doubtful import. It will hardly be denied that they are profane. * * *"

The Supreme Court of Mississippi in Orf v. State, decided in June, 1927, 147 Miss. 160, 113 So. 202, said: "We think the language 'Well, the damn thing is done broke up' (referring to the Sunday school being held in the church), implied Divine condemnation, and was 'so used as to constitute a nuisance.'"

In reaching that conclusion the court quoted the definition of "damn" given in Webster's Dictionary, as follows: "To invoke condemnation; to curse; to swear; to invoke condemnation upon; to condemn to eternal punishment in a future world; to consign to perdition."

This court also relied on State v. Wiley, 76 Miss. 282, 24 So. 194, 71 Am. St. Rep. 531, supra.

The Supreme Court of Judicature in the state of New Jersey in 1837, in the case of Johnson v. Barclay, 16 N. J. Law, 1, sus-

tained a conviction for profane swearing. It was alleged in that case that the defendant swore thirty-three profane oaths in the words "By God, etc." It was held that this was sufficient allegation in an information where such language was alleged to have been used profanely. In answer to the contention that these words might have been used innocently the court stated: "It is a sufficient answer to this, to say, that if the words were so used, by the defendant, or were spoken by him in connection with any other words, in the ordinary course of argument, or conversation, then Barclay, the informant, has committed perjury, for he swears that Johnson uttered profane oaths—Profane oaths and rational conversation, are very different things, and it does not require judicial skill to distinguish the one from the other."

The Supreme Court of Arkansas in 1894, in the case of Bodenhamer v. State, 60 Ark. 10, 28 S. W. 507, considered the sufficiency of an indictment and instruction in the prosecution for profane swearing and cursing. It was held that the following instruction to the jury was proper, to wit: "The jury are instructed that, before they are authorized to find the defendant guilty, they must believe beyond a reasonable doubt that the defendant did, in Baxter county, and state of Arkansas, within twelve months preceding the indictment, profanely swear or curse. To profanely swear would be to irreverently, disrespectfully, or contemptuously take the name of God in vain."

Under these decisions, the indictment having alleged that the language is profane, the defendant having referred to an individual as "damned," having used the expression "By God" irreverently, and having announced his intention to call down the curse of God upon certain individuals, was properly convicted of using profane language within the meaning of that term as used in the act of Congress prohibiting the use of profane language in radio broadcasting.

Appellant further contends that the trial judge committed error in proceeding with the trial of the case after appellant had filed an affidavit charging prejudice. This matter is not properly presented for our consideration, for the reason that the affidavit and the order striking out the affidavit, although printed in the transcript, are not incorporated in the bill of exceptions and not a proper part of the record. Beach v. U. S. (C. C. A.) 35 F.(2d) 837; Bassing v. Cady, 208 U. S. 386, 28 S. Ct. 392, 52 L. Ed. 540, 13 Ann. Cas. 905; Ingram v. U. S. (C. C. A.) 5 F.(2d) 940. We have examined the affidavit and find that it was filed on the day of trial, and that the affidavit does not set forth any excuse for the failure to present same at the time fixed by law, ten days before the trial, and for that reason was insufficient and was properly stricken from the record. The allegations of the affidavit were also entirely insufficient and amounted to little more than a general allegation that the judge was intimately acquainted with people and newspapers who were supporting chain stores and that appellant was engaged in a campaign against such chain stores. It was therefore alleged upon this basis that the judge was prejudiced against the defendant. These allegations are too general to raise the issue of prejudice, but we base our decision upon the ground that the affidavit was filed too late and is therefore properly stricken from the record.

Judgment affirmed.