240 So.2d 689

Jim BAINES

v.

CITY OF BIRMINGHAM.

6 Div. 41.

Court of Criminal Appeals of Alabama.

June 30, 1970.

Rehearing Denied Sept. 15, 1970.

George C. Longshore, Birmingham, for appellant.

J. M. Breckenridge and William C. Walker, Birmingham, for the City of Birmingham.

PRICE, Presiding Judge.

This appellant was convicted for a violation of Section 16–2 of the General City

Code of the City of Birmingham, Alabama. A fine of $50.00 was imposed as punishment.

The complaint alleges that Jim Baines on to-wit: "November 23, 1968, and within the City of Birmingham at, to-wit: Woodrow Wilson Park, did disturb the peace of others by profane language, to-wit: did use the expression 'God Damn,' contrary to and in violation of Section 16–2 of the General City Code of Birmingham, of 1964."

Section 16–2 of the General City Code of Birmingham reads:

"Any person who disturbs the peace of others by violent or offensive conduct, or carriage, or by loud or unusual noises, or by profane or obscene or offensive language, or any person who shall commit any act or diversion causing or tending to a breach of the peace, or any person who shall be guilty of lewd, immoral or indecent conduct, or any person who shall use any obscene or filthy language in a public place, or any person who shall commit any act or diversion tending to or calculated to bebauch the morals of any person, shall be deemed guilty of disorderly conduct, and, upon conviction, shall be punished as provided in section 1–6."

The defendant filed motion to quash the complaint, which motion was denied, whereupon a demurrer was filed and was overruled by the court. The motion and demurrer, in identical language, read, in pertinent part:

"1. Section 16–2 of the General City Code of Birmingham is unconstitutional as a deprivation of the Defendant's rights of free speech and assembly guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and by Article I, Section 1 and 4 and Article I, Section 25 of the Constitution of Alabama.

"2. Section 16–2 of the General City Code of the City of Birmingham is unconstitutionally vague and the Defendant cannot be adequately appraised of the charges against him in violation of the Fourteenth Amendment of the Constitution of the United States."

The refusal of the trial court to quash the complaint is not reviewable on appeal. White v. City of Birmingham, 41 Ala.App. 181, 130 So.2d 231; Phifer v. City of Birmingham, 42 Ala.App. 282, 160 So.2d 898.

The demurrer was properly overruled. The ordinance follows the language of Section 119(1), Title 14, Code of Alabama, 1940. We have held that the statute is not unconstitutional as a deprivation of free speech. Abernathy v. State, 42 Ala.App. 149, 155 So.2d 586, reversed on other grounds, 380 U.S. 447, 85 S.Ct. 1101, 14 L.Ed.2d 151. Our only concern here is with the validity of the provision of the ordinance denouncing the offense of disturbing "the peace of others by profane language" and we hold that this provision of the ordinance is not so vague and uncertain as to be violative of the Fourteenth Amendment to the Constitution.

At the conclusion of the City's evidence the defendant moved to "suppress or quash the evidence on the grounds that they have failed to make out a case, and that they have not proved that a breach of the peace did occur in this case." The motion was denied.

The evidence for the City tends to show that on the afternoon of November 23, 1968, the defendant was speaking over a public address system on a platform in Woodrow Wilson Park in Birmingham. The platform was on the south side of the park where 20th Street comes into 7th Avenue. Defendant was 20 to 25 feet from 20th Street. The loud speaker was facing 20th Street. A few people were on the platform with defendant and forty or fifty spectators, some of whom were women and teenagers, were across the street on apartment balconies and other locations in the vicinity. The speaker was loud and could be heard some distance.

Officer James A. Gray's version of defendant's conduct was as follows:

"I wouldn't exactly call it a speech. It was just a general talk or whatever seemed to come into his mind. * * * Well, in the course of what he might have called a speech he called the police officers standing there a bunch of pigs, and asked 'why don't you bunch of pigs go arrest that bunch of drunk Shriners down the street there that have been raising havoc in town all morning.' And this went on for several minutes. Finally he said, 'Well, look, there is one, or there is a Shriner beating up a boy down the street,' and he pointed west on 7th Avenue about half a block away. I looked, and I saw a Negro boy and a man, and they were shoving each other back and forth. So, Officer Mann, Sims and myself started in that direction, and Baines said, 'Run, god damn it, run' and he repeated it again." * * *

"He made mention of some cars that were parked around with license tags in violation, and asked us why didn't we arrest them, and asked us why we didn't put all of these drunk Shriners in jail."

When asked to describe defendant's speech, the witness said:

"Just whatever came to his mind concerning the police, and the Shriners. That was the main subject of the speech, 'why we let this bunch of drunk Shriners.' As he described them, 'get away with all the parades and their loud cars,' and things like that downtown."

Officer Gray and Sims and Mr. Jack Martin Barlow testified the defendant said, "Run, god damnit, run." Officer Reed Wayne Harper, and Mr. Joe Aloia, testified the defendant said, "Run, god damn you, run."

The defendant testified his group was holding a demonstration or rally at the park in support of the Czechoslovakian student's protest of the Russian invasion of Czechoslovakia; that later in the afternoon he took the loud speaker and was making remarks critical of the police; that he said the police "were applying a double standard of justice. That they were trying to harass us. That they were totally ignoring other people who were breaking laws very flagrantly, and who were disturbing the peace, and who were extremely noisy, and who were turning smoke machines on us, and who were screaming and yelling and driving around in circles in the street, drinking, carrying their bottles, and waving them out of cars. The police were doing nothing about that, but they were harassing * * *." In the course of these remarks he noticed a fight or shoving match going on. He said a drunken Shriner was attacking one of his friends down the street and he and other people asked the police several times to break it up. Then he said, "If the police won't do anything about it we will have to try to stop it ourselves, and they got up and started, you know, standing around and moving in that direction. They didn't move, you know, directly towards the fight. I was extremely angry. My friend was being beaten up. So I said, 'Run god damnit, run.'"

Counsel for defendant urges that the court erred in overruling the motion to "quash or suppress the evidence" because the evidence failed to show that a disorder occurred or that anything the defendant said caused a breach of the peace. In Abernathy v. State, supra, we held that to constitute a breach of the peace it is unnecessary to prove that the peace has actually been broken, citing People v. Kovalchuck, Co.Ct., 68 N.Y.S.2d 165; People v. Ripke, Co.Ct., 115 N.Y.S.2d 590.

In Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, the court said:

"There are certain well defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and insulting or 'fighting' words—those which by their very utterance inflict injury or

tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' Cantwell v. Connecticut, 310 U.S. 296, 309–310, 60 S.Ct. 900, 84 L.Ed. 1213."

In Oney v. Oklahoma City, 10 Cir., 120 F.2d 861, (Note 12, p. 865) reads:

"While the ecclesiastical courts punished blasphemy as an offense against God, it was not so viewed by the temporal courts. The latter regarded it as injurious to the essential interests of society, or as tending directly to a breach of the peace, and in the latter sense it was punishable at common law," citing, among others, the case of Goree v. State, 71 Ala. 7.

In Duncan v. United States, 48 F.2d 128, (9th Cir. 1931), the court defined "profane" as "[i]rreverent toward God or holy things; speaking or spoken, acting or acted, in manifest or implied contempt of sacred things; blasphemous; as, profane swearing." Also, "Any words importing an imprecation of divine vengeance." See also, Thompson v. State, 34 Ala.App. 608, 42 So.2d 640.

After reviewing several decisions involving the use of profanity, the court, in *Duncan,* supra, said:

"Under these decisions, the indictment having alleged that the language is profane, the defendant having referred to an individual as 'damned,' having used the expression 'By God' irreverently, and having announced his intention to call down the curse of God upon certain individuals, was properly convicted of using profane language * * *."

In Gagliardo v. United States, 366 F.2d 720 (9th Cir. 1966) the court said:

"Although the district court's instruction defining 'profane' is not criticized by appellant, the government does not contend that the words used were 'profane.' Since the only words attributed to appellant which could even remotely be considered as being 'profane' were 'God damn it,' which were also uttered in anger, there is no basis for holding that the language was 'profane' within the meaning of the statute. See Duncan v. United States, supra."

 Since Gagliardo cites and relies on *Duncan,* the inference, although illogical, to be drawn from Gagliardo is that to constitute profanity an accused must imprecate divine vengeance upon an individual and that while the expression "God damn you" is considered profanity, "God damn it" is not. The evidence in this case presented a question for the jury whether the defendant uttered the words "God damn you" or "God damn it."

We are further of opinion that the language was spoken in circumstances which threatened a breach of the peace. Williams v. District of Columbia, D.C.Cir., 419 F.2d 638.

The judgment is affirmed.

Affirmed.

On Rehearing

CATES, Judge (concurring specially).

Since the banning of prayers in public schools, can word be "profanity" in a public park? Would "God damn" offend a Buddhist or Taoist not acculturated in Western mores or parlor behavior? Are we putting a legal sanction behind Judaeo-Christian morals?

At one time on the European Continent it appears that a "God damn" meant an

Englishman,[1] no doubt because of the prolixity of our progenitors profanity. Regardless of the Darwinian controversy, language evolves and meanings change, glosses are added and atrophy peels off older encrustations. Euphemisms, for indecency come creeping in the tent like camels' noses, e. g. Gilbert and Sullivan's *Ruddigore*.

In a Dictionary of Contemporary American Usage, Bergen and Cornelia Evans tell us (pp. 64, 65):

"blasphemy; profanity; cursing; swearing; indecency; obscenity; vulgarity. Coarse and violent talk rarely confines itself to one category and the fact that several words are usually applicable to any such outburst may have helped to create a vagueness in the popular conception as to the exact meaning of many of the words used to describe it.

\*　.　\*　　\*　　\*　　.\*　　\*

"A fane is a temple and an act or word is profane when i. uses sacred things that belong in the temple irreverently. Profane also, has the innocuous meaning of 'secular' (Professor of Sacred and Profane History). It is profanity to take the name of God 'in vain.' Blasphemy is profanity, an impious utterance or action concerning God or sacred things. It was blasphemous in the eyes of many Jews to pronounce one of the four-letter symbols for God rather than using one of the substitute words, to call Him jaweh or jehovah, that is, instead of adonai or lord. This is interesting because it shows that one sect's reverence may be another sect's blasphemy.

"Cursing and swearing are frequently used together, as if they meant the same thing. But they are quite different. A curse is the expression of a wish that evil befall another. To swear is to make a solemn, declaration with an appeal to God or some other supernatural being or object to confirm the declaration, often binding the appeal with an oath. An oath is a formally affirmed statement which also invokes supernatural sanction and often invites penalties in the event of nonfulfillment or prevarication. Neither is improper unless profanely uttered."

Another writer has sardonically said:

"Authors who know better words

Are now using four letter words—

Anything goes."

Here I think the use of the expression "God damn" whether coupled with "it" or "you" was (a) rude, and (b) provocative. In the context of its utterance, Baines issued an invitation to physical violence.

If a jury is properly instructed under the contemporary community standards of "fighting words" I think no question, of law is left.

---

1. Also, Puritans (no doubt afterwards washing out their mouths) used this pejorative in referring to the Cavaliers.