Shields v. State, 187 Wis. 448.

SHIELDS, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 14—June 22, 1925.*

*Criminal law: Assault and battery: Unlawful assembly: Ku Klux Klan parade: Interference by police officer: Pointing and snapping pistol at marcher: Self-defense: Instructions: Witness withholding names of marchers: Harmless error.*

1. The use of city streets for conducting a parade thereon is a legitimate subject of municipal regulation, but ordinances for that purpose must be in general terms and apply to all alike. p. 451.

2. A parade of the Ku Klux Klan, the members of which conducted themselves in an orderly and peaceful manner, is not an unlawful assembly, which is an assembly of three or more persons who, with intent to carry out any common purpose, assemble in such a manner, or so conduct themselves when assembled, as to cause persons in the neighborhood of such assembly to fear that they will disturb the peace tumultously or provoke other persons so to do. p. 451.

3. A simple assault does not justify retaliation with dangerous weapons. p. 453.

4. Where a parade of the Ku Klux Klan on a city street was conducted in an orderly and peaceful manner, the act of a night policeman in raising the mask of one of the marchers was unlawful. p. 452.

5. The evidence is *held* to support the conviction of a night policeman for assault with intent to do great bodily harm when he drew his pistol and snapped the trigger at one of the marchers after he had been struck by such marcher, whose mask he had attempted to raise. p. 453.

6. The refusal of the court to require witnesses to divulge the names of other marchers in the parade was proper as outside the issues. p. 454.

7. Though the court's general statement of the doctrine of self-defense was subject to criticism as requiring an absolute necessity for the use of force, this did not constitute prejudicial error in view of the correct and explicit declaration of the court when treating of the specific rights of defendant under the circumstances. p. 456.

8. In order to construe a mistake in an instruction as prejudicial error, the appellate court must affirmatively find that but for such error there might probably have been a different result. p. 456.

CROWNHART, J., dissents.

ERROR to review a judgment of the circuit court for Grant county: S. E. SMALLEY, Circuit Judge. *Affirmed.*

For the plaintiff in error there was a brief by *McGeever & McGeever* of Dodgeville and *T. J. Webb* of Blanchardville, and oral argument by *W. C. McGeever* and *J. D. McGeever.*

For the defendant in error there was a brief by *George B. Clementson* of Lancaster, special counsel, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Clementson* and *Mr. Messerschmidt.*

OWEN, J. Plaintiff in error (hereinafter called the defendant) was convicted of an assault with intent to do great bodily harm and brings writ of error to review the judgment. *Shields* was night watchman of the city of Boscobel. A parade, consisting of members of the Ku Klux Klan, marched along the main street of said city on the night of August 16, 1924. The parade consisted of both men and women. They wore the regulation regalia of the Ku Klux Klan, consisting of masks and long robes. The parade was organized about half a mile outside the city limits, from which place it started at 9:45 and to which place it returned about forty-five minutes from the time of starting. The, parade proceeded in double column, except that three marched abreast in the front rank. The mayor of the city had given the organization permission to conduct the parade. The occasion had been advertised in the local papers. It seemed to have been generally known that the parade was to be held. A large crowd of people, estimated at six or seven thousand, had assembled on the street to watch the parade. The parade was conducted in an orderly manner. The participants marched with folded arms and neither said nor did anything to cause the least disorder.

There were two police officers in the city of Boscobel: one a day policeman, called the chief of police, and *Shields,* who was called the night watchman. The day policeman

remained on duty on the night of the parade. As the parade was passing along Main street *Shields* stepped from the curb and raised the mask of one of the marchers. He also raised, or attempted to raise, the mask of one or two of the following marchers, and, as he was attempting to raise the mask of another, he was struck on the side of the head by one of the marchers, Bert Flesch by name. He was staggered by the blow and reeled back into the crowd. Upon recovering his equilibrium he drew a revolver from his pocket, pointed it squarely at his assailant, and pulled the trigger. The revolver did not go off. He was grabbed by the crowd and the parade proceeded.

The defendant strenuously contends that the evidence as above outlined does not sustain the conviction. While perhaps not necessary, it is at least appropriate to consider the legal status of the parade and the correlative rights and duties of the defendant under the circumstances then existing. "The rights of persons, societies, and organizations to parade and have processions on the streets with music, banners, songs, and shouting, is a well-established right." *State ex rel. Garrabad v. Dering,* 84 Wis. 585, 590, 54 N. W. 1104.

"It has been customary from time immemorial, in all free countries, and in most civilized countries, for people who are assembled for common purposes to parade together, by day or reasonable hours at night, with banners and other paraphernalia, and with music of various kinds. These processions for political, religious, and social demonstrations are resorted to for the express purpose of keeping up unity of feeling and enthusiasm, and frequently to produce some effect on the public mind by the spectacle of union and numbers. They are a natural product and exponent of common aims, and valuable factors in furthering them. They are only found to any appreciable extent in places having collected inhabitants, for spectators are generally as important as members. They are among the incidental conditions of city life, and are as much to be expected, on suitable occasions, as any other public meetings, and not necessarily any

more dangerous." *Matter of Frazee,* 63 Mich. 396, 404, 30 N. W. 72.

It is well recognized that the use of city streets for such purpose is a legitimate subject of municipal regulation, but ordinances for that purpose must be in general terms and apply to all alike. *State ex rel. Garrabad v. Dering,* 84 Wis. 585, 54 N. W. 1104. There was no ordinance in the city of Boscobel prohibiting the parade, and it was conducted with the express consent of the city mayor. This fact, however, was without any legal, although it may have some moral, significance. Unless the parade can be held to have been an unlawful assembly, its presence upon the street was not in any respect unlawful.

In *Aron v. Wausau,* 98 Wis. 592, 74 N. W. 354, the following definition of an unlawful assembly met with the approval of this court:

"An unlawful assembly is an assembly of three or more persons who, *with intent to carry out any common purpose,* assemble in such a manner, or so conduct themselves when assembled, as to cause persons in the neighborhood of such assembly to fear on reasonable grounds that the persons so assembled will disturb the peace tumultuously, or will by such assembly needlessly, and without any reasonable occasion, provoke other persons to disturb the peace tumultuously."

As already stated, the conduct of the participants was perfectly orderly; they marched with their arms folded across their breasts, and they behaved in every respect in the most peaceful manner. There was nothing in their conduct to give rise to a reasonable belief that they would, or even intended to, "disturb the peace tumultuously." It might be argued that because of the proclaimed principles of this organization, which are exceedingly offensive to certain classes of American citizens, the presence of its members, clothed in their regalia, might provoke those classes of American citizens who are proscribed by its tenets to a breach of the

peace.   It cannot be doubted that the public demonstrations of this order excite resentment on the part of those classes of our citizens whose Americanism the principles of the order condemn.   But experience in our state does not indicate that such resentment justly entertained prompts reprisal by acts of violence or leads to a tumultuous breach of the peace.   This fact testifies most creditably to the 'poise and self-restraint of our citizens who are under Ku Klux Klan proscription.   But however that may be, not only the general experience of our state, but the result of the parade in question, does not justify a conclusion as a matter of law that the demonstration was one tending to "provoke other persons to disturb the peace tumultuously."   We must conclude, therefore, that the marchers offended against no law and that they were legally upon the streets of the city of Boscobel.   Being legally upon the streets, the defendant had no more right to interfere with their presence, or to commit an assault upon the individual marchers, than upon any ordinary pedestrian or traveler upon the streets.   On the contrary, if their presence had any tendency to create a disturbance of the peace, it was the duty of the defendant to so conduct himself as to discourage or suppress such a disturbance rather than promote it, and we cannot but think that the consequences resulting to the defendant because of · his conduct were such as might have been anticipated by any reasonable person.   This fact might be of controlling consideration had the individual whose mask he raised delivered the blow upon the defendant, as one who seeks to invoke the aid of self-defense cannot be the aggressor.   Whether this principle applies in its full force where another member of the parade sought in this manner to protect the parade from such interference, we need not consider.   We think it was a circumstance which might be legitimately considered by the jury and fixes the act of the defendant which invited the assault as an unjustifiable and unlawful act.

Flesch did no more than deliver a single blow. There is no evidence that he attempted to follow it up. There is evidence to indicate that when the defendant recovered from the staggering effects of the blow and pulled his revolver he did not know who his assailant really was, but he merely happened to aim it at Flesch. If this be true it does not indicate that he pulled his revolver in good faith or in the belief that his personal safety was in jeopardy. It is unnecessary to dwell further upon the evidence. It furnishes abundant support for the conclusion that the defendant did not pull his revolver because of an apprehension reasonably entertained by him that either his life or his personal safety was in jeopardy. A simple assault does not justify retaliation with dangerous weapons. 21 Cyc. 790 and cases there cited. Although the defendant testified that he thought he was struck with a bludgeon of some sort, the evidence is quite conclusive—at least it is sufficient to support the conclusion of the jury to that effect—that Flesch struck him merely with his bare fist.

The point is made that the evidence on the part of the State does not show that the defendant pulled the trigger of the revolver, and that for this reason the defendant should have been discharged when the State rested its case. Flesch testified that the revolver was pointed at him with the muzzle four or five feet away, and he thought he heard it snap once. Another witness testified that a short time after the event the defendant said to him: "Look here. I got my Waterloo." The defendant took his gun and said: "I don't know why that missed today." This testimony justified the inference that the defendant, when he aimed the revolver at Flesch, also pulled the trigger. Upon his cross-examination the defendant himself testified that when he aimed the revolver he did pull the trigger, and that the revolver did not go off, although it was loaded. We think there is nothing in the contention that the evidence does not support the

verdict, or that the state of the evidence at the time the State rested demanded a discharge of the defendant.

A reversal is urged because the court did not require witnesses to divulge the names of other marchers in the parade. We cannot see how this has the remotest bearing upon the issues. Whether Tom, Dick, or Harry was in the parade could have no bearing upon the guilt or innocence of the defendant. The court did well in limiting the evidence to the issues in the case.

It is further urged that the court erred in his instructions to the jury concerning the doctrine of self-defense. In dealing with the question of self-defense the court said this:

"The right of self-defense is simply the right to repel force by force. The force thus permitted to be used must be protective merely and not aggressive. The doctrine of self-defense cannot be invoked where one has used more force than was necessary to his protection. In defending one's self, no more force should be used than is necessary; and if one uses more force than is reasonably necessary he will be guilty of an assault. One attacked may oppose violence by violence, and the limit of his privilege is this: that he must not apply a degree of force not called for in self-defense.

"In considering this question of self-defense it will be your duty to consider all the facts and circumstances bearing upon the conduct of the defendant and upon the conduct of the complaining witness Bert Flesch at the time and place in question as shown by the evidence.

"You are instructed that it constituted no violation of the laws of this state for the said Bert Flesch and others to take part in the public parade shown by the evidence to have been had on the night in question, so long as the same was conducted in a peaceable and orderly manner, and that the defendant as a police officer of the city of Boscobel had no right or authority to interfere with such parade so long as it was conducted in a peaceable and orderly manner. But if, after he was struck by Flesch, the defendant had reasonable ground to believe, and in good faith believed, that his life was in danger or that he was likely to suffer great bodily harm, he had a right to meet any attack made upon him or

which he had reasonable ground to believe was being made upon him, in such a way and with such force as under all the circumstances he at the moment honestly believed and had reasonable grounds to believe was necessary to save his own life or to protect himself from great bodily harm."

Complaint is made of the following excerpt from the quoted portion of the charge:

"The doctrine of self-defense cannot be invoked where one has used more force than was necessary to his protection. In defending one's self, no more force should be used than is necessary; and if one uses more force than is reasonably necessary he will be guilty of an assault. One attacked may oppose violence by violence, and the limit of his privilege is this: that he must not apply a degree of force not called for in self-defense."

It is said that this is not a correct statement of the law, as the right of self-defense is not limited to the absolute necessity of the occasion, but only by what reasonably appears to the assaulted party to be dangerous at the time, viewed from his standpoint and no other; accordingly, he may act on apparent danger as it reasonably appears to him at the time, and that the danger need not be real nor is it necessary that there should be actual peril to his life or serious bodily injury. The following statement of the right of self-defense was approved in *State v. Martin,* 30 Wis. 216, 225:

"When a person is attacked or menaced with an immediate attack by another who is in striking distance and has the means and ability to at once execute it, the person attacked or thus menaced may act upon what are then the appearances of the degree of violence used or threatened, and may graduate the force of his resistance to the apparent nature of the attack, and if he acts in good faith upon what are then the appearances of the nature of the attack he will be justifiable, though such appearances subsequently prove unreal."

It is true that in that portion of the charge just quoted the court did not advise the jury that the defendant could act

upon what were the dangers as they appeared to him at the time and under the circumstances. This part of the charge, however, was simply the statement of a general proposition of law. When the court came to charge the jury upon the specific rights of the defendant under the then existing circumstances, the court said:

"But if, after he was struck by Flesch, the defendant had reasonable ground to believe, and in good faith believed, that his life was in danger or that he was likely to suffer great bodily harm, he had a right to meet any attack made upon him or which he had reasonable ground to believe was being made upon him, in such a way and with such force as under all the circumstances he at the moment honestly believed and had reasonable grounds to believe was necessary to save his own life or to protect himself from great bodily harm."

That was correct, plain, and explicit; although the general statement of the principle at the beginning of the charge upon that branch of the case is subject to just criticism, we cannot regard it as prejudicial error in view of the correct and explicit declaration of the court when treating of the specific rights of the defendant under the circumstances. It is well settled that in order to construe the mistake as prejudicial error it is necessary for us to affirmatively find that but for the error there might probably have been a different result. A review of the evidence satisfies us that there would have been no different result, and that the error cannot be construed as prejudicial.

*By the Court.*—Judgment affirmed.

CROWNHART, J. (*dissenting*). *George Shields,* the defendant below, had been a farmer until a couple of years before the unfortunate affair resulting in his conviction of a serious crime. He was a man past the meridian of life, and had retired to the peaceful little city of Boscobel of some fifteen hundred souls in Grant county. Apparently he was a man of good repute. He was employed by the city

and the merchants thereof, each paying one half his salary, as night watchman and policeman for some two years, and was so employed at the time of his trouble with the Ku Klux Klan.

In these modern days courts seldom profess ignorance of matters of common knowledge.  It is a matter of common knowledge that the Ku Klux Klan is an organization having for its creed certain religious and racial antipathies which have led to disorders, riots, and bloodshed.  That the members of the Klan have a legal right to have and maintain their peculiar beliefs is admitted.  That they have the right to do the things that lead to public disorder, disturbance of the peace of our citizens, or to riots and bloodshed, is denied.  The Klan is a secret order given to mysterious acts and practices, like the burning of crosses swathed in rags and oil in public places, keeping its membership secret, holding mass meetings in open fields under guard, and parading the highways in robes and masked faces.

Boscobel had been disturbed by Ku Klux Klan activities, and prior to the night in question an open field meeting near Boscobel had been advertised in the newspaper of that city, as follows:

"There will be a regular meeting of the Knights of the Ku Klux Klan on the Miller field at Boscobel, August 16, 1924, at 8 p. m., for men only.  Apply for admittance at the gate.  Klansmen, bring your robes for a parade.

"The public meeting scheduled for this date has been postponed to a later date in order to secure a big fireworks demonstration to be staged at that time.

"EXECUTIVE COMMITTEE."

It will be seen by the advertisement that no public announcement of a parade in the city was given, but it had evidently been mysteriously anticipated so that a large crowd of people had congregated in the city from the surrounding country, many of whom were strangers.

The mayor of the city had given oral permission to the Klan to parade the streets of Boscobel, but at what time and

under what conditions does not appear.   The mayor testified that he expected the parade to take place at a reasonable hour.   No public notice of the permission had been given, and it seems that only the day policeman had been notified of· such permission.   *Shields* had not been notified, and did not know that any permission for the parade had been given.   It should be stated here that the power to grant such permits is in the common council and not in the mayor. Sub. (5), sec. 62.11, Stats.

About 10:45 p. m. of the night in question *Shields* heard that the Klan was marching into the city.   Prior thereto, on the streets of Boscobel, he had overheard conversations of various persons during the evening, which led him to think that if the Klan marched on the main street where the crowd was, there might be trouble of a serious nature.   He therefore proposed to the day policeman, who was present, that he would meet the marching Klan and turn them onto a side street.   The day policeman responded, "All right," and *Shields* proceeded to meet the marchers.   He met them and commanded them to halt.   The Klansmen in the line, eighty to one hundred members, disregarded his command and continued their parade into the city.   The marchers were disguised with robes, and masks over their faces.   *Shields* thereupon sought to identify the leaders by raising the masks of three members in turn as they marched by him.   As he started to lift the mask of the third member, one of the members marching on the side opposite from him stepped out of line and struck *Shields* a wicked blow from behind on his head, resulting in knocking *Shields* back into the crowd that lined the sidewalk, partially stunning him and evidently confusing his mind.   The blow was evidently struck with some blunt weapon, as it raised a lump on *Shields'* head about the size of a walnut, which did not disappear for some days.   *Shields* recovered his position, pulled a revolver from his pocket, and attempted to shoot his assailant.   The gun missed fire and no damage was done.   Later he was arrested,

charged with assault with intent to do great bodily harm, and convicted on a jury trial.

Every person charged with crime is entitled to a fair and impartial trial. It is the province of this court to guard that right with jealous care. This case presented questions of fact for the jury, and if properly submitted to the jury the conviction should stand. However, it is contended that serious errors were committed on the trial which prejudiced the defendant.

A woman who had marched in the parade was a witness for the State, and on cross-examination of the witness the defense attempted to prove the *res gestæ* by inquiring of the witness as to who her marching partner was. Then this happened:

By defendant's attorney:

"*Q.* Who was marching with you? *A.* A Klans-lady.

"*Q.* Who was it? *A.* A Klans-woman.

"*Q.* Did you know her name at the time? *A.* I did.

"*Q.* Do you know her name now? *A.* Well, I ought to remember that far.

"*Q.* Who was it? *A.* A Klans-woman.

"*Q.* What was her name? *A.* I answered that question.

"The Court: You don't wish to disclose the name of the lady, Mrs. Haggerty? It isn't the lady that you claim *Mr. Shields* approached? The witness: No, sir.

"The Court: He passed you? The witness: Yes, sir.

"*Q.* What was her name?

"The Court: Well, I ask you is there any reason why you do not wish to disclose the name of the lady that was marching with you? The witness: Yes, sir.

"The Court: Well, you don't need to disclose it if you don't wish to."

It is to be remembered that the Klansmen were disguised, and *Shields* had no other way of identifying members except through the State's witnesses, the Klan members themselves. I think it is a general and uniform rule of law that matters of *res gestæ* are subject to proof in either civil or criminal cases. See 16 Corp. Jur. 572; Jones, Ev. §§ 821, 826.

It will be noted that the trial court did not rule out this evidence on the ground that it was immaterial or improper, but on the ground of privilege to the witness.   The witness objected to testifying on the subject and the court sympathetically excused her.   The district attorney had made no objection.   The action of the court would seem to· indicate a sympathetic attitude on its part to the witness, which might well and probably did impress the jury.   I think the ruling of the court was prejudicial error.

I pass other objections urged by counsel and proceed to the objection to the instructions of the court to the jury. The instructions objected to are quoted in the majority opinion.   They need not be repeated here.   But in the first paragraph of the quoted instructions there are six separate erroneous statements of the law of self-defense—the defense relied upon for acquittal.   These statements follow:

1. "The right of self-defense is simply the right to repel force by force."

2. "The force thus permitted to be used must be protective merely and not aggressive."

3. "The doctrine of self-defense cannot be invoked where one has used more force than was necessary, to his protection."

4. "In defending one's self, no more force should be used than is necessary."

5. "And if one uses more force than is reasonably necessary he will be guilty of an assault."

6. "One attacked may oppose violence by violence, and the limit of his privilege is this: that *he must not apply a degree of force not called for in self-defense.*"

These statements are positive and unequivocal.   Each and every one is admittedly incorrect.   But it is said that they were made by way of introduction to a correct instruction on the subject and were followed by a correct statement of the law.   A reference to the instructions quoted shows that the statements excepted to were not by way of introduction of the correct statement, but were complete in themselves

and separated from the correct statement by other matter. The situation is just this: The court gave the jury six erroneous instructions on the law of self-defense on the point vital to defendant's case, and once in a distinct and separate part of his instructions the court gave a correct interpretation of the law. That must have left the jury in utter confusion as to which instructions were right and which were wrong. How can it be said that the erroneous instructions were nonprejudicial? The office of an instruction is to state the law clearly and in precise language so that the jury may comprehend the instruction and not be confused thereby. To my mind the erroneous instructions were highly prejudicial and constitute reversible error.

The jury were further instructed, in substance, that it was no violation of law for the Klan to peacefully parade at the time and in the manner in which it did, and that the defendant had no right to interfere therewith. I think this instruction was erroneous. The Klan had no right to march on the streets of Boscobel at a time and in a manner tending to create a breach of the peace.

"In general terms a breach of the peace is a violation of public order, a disturbance of the public tranquillity, by any act or conduct inciting to violence or tending to provoke or excite others to break the peace. By 'peace,' as used in the law in this connection, is meant the tranquillity enjoyed by citizens of a municipality or community where good order reigns among its members, which is the natural right of all persons in political society. It is, so to speak, that invisible sense of security which every man feels so necessary to his comfort, and for which all governments are instituted. It is not necessary that the peace be actually broken to lay the foundation for a prosecution for this offense. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required. Nor is actual personal violence an essential element in the offense. If it were, communities might be kept in a constant state of turmoil, fear, and anticipated danger from the wicked language and conduct of a guilty party, not only destructive of the

peace of the citizens but of public morals without the commission of the offense. The good sense and morality of the law forbid such a construction."

"Whether or not a given act amounts to a breach of the peace can only be determined in the light of the circumstances attending the act, and the time and place of its commission. It is well known that an act which if committed at a certain place or time would not amount to a breach of the peace might well be considered as a crime if committed at another time or place or under different circumstances." 8 Ruling Case Law, pp. 284, 285, §§ 305, 306.

We must consider the natural tendency of an organization marching in disguise, whose creed proscribes certain religious orders, certain classes of American citizens, and persons not native-born citizens. We must consider that the Klan was marching into the city at an unseemly hour of the night when peaceful citizens were seeking repose. They were largely strangers to the city of Boscobel. We must consider that it is common knowledge that such occasions had heretofore caused serious disturbances of the peace in this country. It is said that they were marching peacefully with folded arms. But they had adopted the disguise of the criminal, and under their robes might have been concealed dangerous weapons. A peaceful citizen need not hide his face in public places, and they should not do so in the nighttime so the peace officers may not recognize them.

It is clearly the duty of a night policeman to preserve quiet and tranquillity on his beat during the ordinary sleeping hours of the citizen. It is his duty at all times to prevent a breach of the peace by all reasonable means. He is not required to stand idly by until a breach of the peace actually occurs or until a riot is in process. He may and should prevent those acts naturally tending to a breach of the peace. A police officer is not required to judge with absolute nicety what acts may disturb the peace. He may act on the facts as they appear to him if he acts within reason. The court should so have instructed the jury instead of giving the jury

to understand that *Shields* was acting wholly without author-
ity. *Shields,* to my mind, was the innocent victim of a
dastardly assault. He was convicted for doing his duty
while his masked assailant goes free.

For these reasons I respectfully dissent.