130 So.2d 198

Jesse C. MITCHELL

v.

STATE.

7 Div. 625.

Court of Appeals of Alabama.

March 7, 1961.

Rehearing Denied March 21, 1961.

———◆———

Raymond Murphy, Florence, for appellant.

MacDonald Gallion, Atty. Gen., and Jos. D. Phelps, Asst. Atty. Gen., for State.

CATES, Judge.

This is an appeal from a judgment on an original misdemeanor complaint brought and tried in the DeKalb Superior Court. See Code 1940, T. 15, § 119, and § 7 of Act No. 637 of September 18, 1957 (1957 Acts, p. 956, 957). This latter section provides for trial of a misdemeanor on a complaining affidavit "as though the defendant had been indicted by a grand jury."

Mitchell was convicted by a jury on a complaint reading:

"Before me, Herbert G. Tate, Clerk of the DeKalb County Superior Court, of said County, personally appeared John L. McGriff who, being duly sworn, deposes and says that he has probable cause for believing, and does believe that *within twelve months before making this affidavit*, and in said county

Count One: Jesse C. Mitchell whose name to affiant is otherwise unknown did disturb the peace of others by violent, profane, indecent, offensive or boisterous conduct or language, or by conduct calculated to provoke a breach of the peace." (Italics added.)

The court adjudged him guilty and sentenced him to sixty days in the county jail.

Mitchell had demurred to the complaint assigning, among others, these grounds:

"2. The affidavit as to each count is insufficient to charge any offense.

\*    \*    \*    \*    \*    \*

"5. Count one fails to name the party or parties alleged to have been disturbed, or to name the place of such alleged disturbance and therefore the affidavit as to Count 1 is void."

His demurrer having been overruled, he was put to trial.

The first prosecution witness was Mr. L. D. Pack, pastor of the New Bethel Baptist Church, near Powell's Cross Roads, DeKalb County. Mitchell had formerly been the minister of this church. After the congregation split, Mitchell led the minority group in setting up another church nearby.

Pack saw Mitchell on January 13, 1960, as he drove across the New Bethel church-yard "out toward the cemetery and got out of his automobile and was there on the church property." Pack described Mitch-ell's actions as "a little bit unbecoming * * * a little bit haughty, a little bit strutty. * * * He got out of his car. I was standing in the yard and he got out of his car and didn't recognize me as being the minister, the pastor in the church and rammed his hands down in his pockets and strutted around quite a bit."

Pack did not know of Mitchell's having "any feasible business * * * there at that time." Mitchell crossed the church-yard and on reaching the cemetery talked to a group of ladies working there.

Pack became unnerved when two men of the congregation (one of whom was the complainant, McGriff) drove up. Pack set off to get Brother Stallings for "help to quell the situation."

Before the incident, Mrs. Pack was in a normal "health condition" but since that time the condition of her health had been "rough."

Pack further testified that some time after the 13th of January he was walking to his mail box and saw Mitchell and his wife coming down the road "laughing and carrying on." It seemed to Pack that "they were mighty well tickled about something."

Mrs. Pack testified that she and her husband lived in the pastorium which was next to the churchyard. Of the January 13 incident she testified substantially as had her husband.

Her testimony—to which no objection was interposed—went on:

"Q. What was the condition of your health just prior to this incident here in the church yard? A. I was very happy, a good outlook on life. I was tense, definitely tense and having suffered a coronary thrombosis prior to this, and what I mean by coronary thrombosis is a blood clot and this definitely disturbed my heart and it also—I have ulcerated stomach and you don't get that as you know anni-hilated by the anxiety and nervous tension which was keeping me very much upset."

Defense counsel cross-examined her on this point:

"Q. Now, you have stated to the Court and Jury about this thrombosis and ulcers and all those things and your condition, do you tell the Jury that your present nervousness and all is partly due now to this happening in the cemetery? A. I certainly do.

"Q. The thrombosis and ulcerated stomach? A. Yes, sir, definitely true. When you disturb the heart well you disturb the whole entire body. When the nervous system gets upset you disturb the heart. When your nervous system gets upset you disturb the ulcer. What it did do, upset me, and knowing the tensions and knowing he knew he wasn't supposed to be there and know-ing the general routine, everybody's feelings in and around there."

Another witness for the State, Mr. Kyle Perry, a member of the New Bethel Church, testified:

"A. One morning while he was sitting in the car with his daughter, probably waiting on the school bus, at the cross roads at Inez Wood's home; and I had started to work that morn-ing. As I pulled out into the highway he was sitting at an angle to me but when I pulled out into the highway I

consider you would call it he made a face. He hunched up in the windshield as if to say who are you.

"Q. What was his facial expression or gesture? A. He had the glass rolled up and he got right up next to the windshield and kinda blowed up his face.

"Q. Did he do anything, stick out his tongue? A. No.

"Q. Or shake his fist at you, anything like that? A. No, he didn't.

"Q. No threat toward you? A. That is correct. I was by myself in my car.

"Q. About when did this happen, please? A. I don't know exactly the time, but it was a I believe along in December because it was cold weather. I had my glasses up and he had his glasses up."

Mr. McGriff, who had sworn out the complaining affidavit, also testified. The State did not produce the ladies who had been working in the cemetery.

This evidence, including the cross-examination, can be summarized as showing that Mr. Mitchell (1) came into the churchyard "a little bit haughty," "strutty," and with his hands rammed down in his pockets; (2) crossed over to the adjoining graveyard; (3) spoke to some ladies there; and (4) on an earlier occasion he had puffed up his cheeks at a former brother.

At the conclusion of the State's case, Mitchell moved to exclude the testimony on the ground of there being no legal evidence to support Count One of the complaint. The court overruled the motion.

Mitchell was the only defense witness. He accounted for being at the cemetery in seeking information of the whereabouts of a Mr. Tally Wood. He denied blowing up his cheeks.

The State contends that Mitchell was properly accused and convicted under Act No. 87 of June 24, 1959 (Acts 1959, p. 508), the first section of which reads:

"Any person who disturbs the peace of others by violent, profane, indecent, offensive or boisterous conduct or language or by conduct calculated to provoke a breach of the peace, shall be guilty of a misdemeanor, and upon conviction shall be fined not more than five hundred dollars ($500.00) or be sentenced to hard labor for the county for not more than twelve (12) months, or both, in the discretion of the court."

Inasmuch as the Legislature has not prescribed a form of complaint for violations of this statute, we must fall back, for the formal requirements of the accusation, upon those specified by the common law as modified by statute. Our Constitution provides pertinently as follows:

"Sec. 6. That in all criminal prosecutions the accused has a right * * * to demand the nature and cause of the accusation; and to have a copy thereof; * * *"

Amendment XXXVII (superseding § 8): "* * * in cases of misdemeanor, the legislature may * * * dispense with a grand jury and authorize * * * prosecutions * * * before * * * inferior courts * *"

"Sec. 9. That no person shall, for the same offense, be twice put in jeopardy * * *"

Jones v. State, 136 Ala. 118, 34 So. 236, repudiates the bill of particulars in our criminal practice as a means toward making the indictment more definite and certain.

Our Code has relaxed the rigidity of the common law description of the accused (christian name, surname, estate, trade or calling, residence), the time and place of the charged act, and the offense— if need be in apt words, e. g., "murdered," "feloniously," "burglariter," etc. iv Bl. Com. 306. Code 1940, T. 15, §§ 227–249,

applies by catchline and context to indictments and thus, a fortiori, to complaints of misdemeanors.

Aside from the general guide rule of Code 1940, T. 15, § 231, the basic requisites come from §§ 232 and 233:

"§ 232. The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment; and in no case are the words 'force of arms' or 'contrary to the form of the statute' necessary.

"§ 233. The words used in an indictment must be construed in their usual acceptation in common language, except words and phrases defined by law, which must be construed according to their legal meaning."

The averment of time is regulated by § 237; that of place is dispensed with by § 238.

Besides those of §§ 232 and 233, supra, the provisions of §§ 236 and 247 fit into the consideration of this case:

"§ 236. When a statute creating or defining an offense uses special or particular terms, an indictment on it may use the general term which, in common language, embraces the special term."

"§ 247. When the offense may be committed by different means * * * such means * * * may be alleged in the same count in the alternative."

This new offense of "disturbing the peace of others," is limited by the statute in that it must be caused

(1) either by

(a) *conduct* which is violent, profane, indecent, offensive or boisterous; or by

(b) *language* which is violent, profane, indecent, offensive or boisterous; or by

(2) *conduct* calculated to provoke a breach of the peace.

Thus the act denounces disturbing the peace of others in any of three ways, i. e., two species of conduct and one of words.

We find no difficulty as to the specificity of disturbing "the peace of others by language which is violent, profane," etc. We pretermit consideration of conduct of that character because we consider that disturbance "by conduct calculated to provoke a breach of the peace" is too vague when not amplified by further particulars.

Thus we illustrate from Turnipseed v. State, 6 Ala. 664:

"Hawkins says, that in charging a statutory offence, it is not 'always sufficient to pursue the very words of a statute, unless by so doing, you fully, directly and expressly allege the fact in the doing, or not doing whereof the offence consists, without the least uncertainty or ambiguity.' Thus it has been adjudged, that an information on the statute of Henry the Sixth, for not abating so much of the price of wine sold as the vessels wanted of the statute measure, is insufficient, if it did not expressly show how much they wanted. So an indictment on the statute against usury, should not merely allege that the defendant took more than the interest allowed by law; but it should be explicitly shown how much was taken.

"In the present case, the statute merely denounces the cruel and unusual punishment of a slave as a public offence, and prescribes the punishment. It does not declare with particularity what are its elements; and consequently, in framing the indictment the statute affords but little aid. Under such circumstances, recourse is to be had to the rules of pleading in criminal cases.

According to these, the general terms in which the charge is made against the defendant, is not sufficient; but it should be alleged what punishment was inflicted and how, that the court might judge whether the accused should have been put upon his trial; that he may know what he is to defend against, and the jury know how to apply the evidence.

"This brings us to the conclusion that the indictment is defective, because of the generality of the terms in which the defendant is charged. * * *"

And from Anthony v. State, 29 Ala. 27, we excerpt:

" * * * It is not sufficient merely to pursue the words of that statute, because it merely designates the offense, but does not characterize it by prescribing in express terms its constituents; and because by pursuing the mere words of the statute, there is no full, direct, and express allegation of the main fact in the doing of which the offense consists, to-wit, the employment of a substance in its nature calculated to destroy human life. * * *"

In his dissenting opinion in Gayden v. State, 262 Ala. 468, at page 476, 80 So.2d 501, at page 509, Mr. Justice Merrill explains the Turnipseed opinion as resting on the rigidity of the criminal law before 1852. Yet it has been cited later.

Strictly speaking, there is no majority opinion of the Supreme Court in the Gayden case. This is because Mr. Justice Lawson concurred (with Mr. Justice Simpson's opinion to which Livingston, C. J., and Mayfield, J., adhered) as to the result. The result, of course, was an order affirming the judgment of this court in Gayden v. State, 38 Ala.App. 39, 80 So.2d 495. Code 1940, T. 13, § 95, provides that the "decisions of the supreme court shall govern the holdings and decisions of the court of appeals." See Willis v. Buchman, 30 Ala. App. 33, 199 So. 886.

Since there is no conflict between the opinions of Mr. Justice Simpson and that of Judge Carr, the concurrence of four justices of the Supreme Court in the affirmance of the Court of Appeals manifests approval of this court's opinion (aside from dicta) as the law of the case. This in turn requires our adherence to Judge Carr's opinion under statutory stare decisis per § 95, supra.

Moreover, we find no principle in the later case of Hochman v. State, 265 Ala. 1, 91 So.2d 500, which conflicts with our views of the instant complaint. Subdivision (7) of Code 1940, T. 22, § 75 (declaring certain per se nuisances deleterious to public health) proscribes "the conducting of a business * * * or the doing of a thing, not inherently insanitary * * * in such a manner as to make it a menace * * * to public health."

The complaint against Hochman accused him of keeping on his "premises * * automobile and airplane tires in such a manner as to make it a menace." Mr. Justice Simpson points out that Hochman was informed of what he did, i. e., the keeping of tires. This act of keeping tires was laid so that from the premise of its commission in the light of the described statutory malum prohibitum the reasonable inference would be for one to subsume a violation of law. That there might be a syllogistic hiatus in the omission of a statement that such tire carcasses serve as collecting pools for breeding mosquitoes, is of a fact subsidiary to the keeping.

The Hochman case reversed this court, 38 Ala.App. 602, 91 So.2d 495, an action which requires the consideration of the Supreme Court en banc. Certainly, that opinion so far as it explains the application of the Gayden rule is the latest reconsideration of an indictment not coming under one of the forms in Code 1940, T. 15, § 259.

To illustrate: if the statute makes it a misdemeanor to spit upon a public sidewalk,

then an allegation that "A. B. (since the date of the Act but not more than twelve months theretofore) spat upon a public sidewalk" should suffice. But if the statute denounces "disturbing the peace of others by doing an act in a public thoroughfare which might menace the health of others," the charge must allege an act done. Otherwise, one generality is only bolstered by another.

 Ground 2 was appropriate to raise any defect as to an alternative averment here. Anderson, C. J., in State v. Collins, 200 Ala. 503, 76 So. 445, pointed out, in considering State v. Nix, 165 Ala. 126, 51 So. 754, that if one or more alternatives in a single count "charge no offense," then on demurrer the indictment would be bad in toto.

Accordingly, we hold the trial court erred in overruling the demurrer to the complaint because the alternative allegation that Mitchell "disturbed the peace of others * * * by conduct calculated to provoke a breach of the peace" was too uncertain in laying the quo modo of the alleged disturbance. Every indictment [and criminal complaint] is presumed to be against an innocent defendant. Bishop, New Crim.Proc. (2d Ed.), § 518.

Also, our traditional and constitutional rights to know of what and why we are accused—in the light of the lack of a bill of particulars—together with the relative ease with which amendments may be made in misdemeanor trials cumulate to this result. In the Gayden case, supra, Carr, P. J., said [38 Ala.App. 39, 80 So.2d 500]:

"The law does not contemplate that a person charged with crime should be brought to trial and stand before the courts of our land unaware or in doubt of the nature and character of the accusation against him."

We are further of the opinion that the evidence was insufficient to show conduct which, under good pleading, can be averred under the statute as a violation. In other words, being strutty, puffing up one's cheeks and jamming one's hands into his trouser pockets as though he were Napoleon may disturb the peace of some people, but the standard for disturbance must be confined to conduct which is violent, menacing, or imports provocation to make another commit an actual breach of the peace. See Ellis v. Pratt City, 113 Ala. 541, 21 So. 206.

Accordingly, the judgment of the trial court is reversed and the cause is there remanded for proceedings consistent herewith.

Reversed and remanded.