155 So.2d 586

**Ralph D. ABERNATHY**

**v.**

**STATE.**

**3 Div. 101.**

Court of Appeals of Alabama.

Oct. 23, 1962.

Rehearing Denied Nov. 20, 1962.

**150**

Fred D. Gray and Solomon S. Seay, Jr., Montgomery, Jack Greenberg and Leroy D. Clark, New York City, and Louis H. Pollak, New Haven, Conn., for appellant.

MacDonald Gallion, Atty. Gen., and Leslie Hall, Asst. Atty. Gen., for the State.

PRICE, Presiding Judge.

The appellant and ten other persons were convicted in the court of common pleas of Montgomery County. In the circuit court, by agreement, the cases were considered as being tried separately, but evidence was introduced only in the Abernathy case and was considered as introduced in all the cases. There was a separate judgment of conviction as to each defendant.

On appeal to this court it is stipulated that the transcript of the testimony be copied into the record in this case only, and be considered a part of the record in each of the other cases, without the necessity of copying it into the record of each of said cases.

The statutes under which the defendant was charged provide:
"Title 14, Sec. 407: If two or more persons meet together to commit a

breach of the peace, or to do any other unlawful act, each of them shall, on conviction, be punished, at the discretion of the jury, by fine and imprisonment in the county jail, or hard labor for the county for not more than six months."

"Title 14, Section 119(1): Any person who disturbs the peace of others by violent, profane, indecent, offensive or boisterous conduct or language or by conduct calculated to provoke a breach of the peace, shall be guilty of a misdemeanor, and upon conviction shall be fined not more than five hundred dollars ($500.00) or be sentenced to hard labor for the county for not more than twelve (12) months, or both, in the discretion of the court."

The evidence shows the eleven appellants involved in these appeals are four white men and seven Negroes. On May 24, 1961, the City of Montgomery was under martial law as the result of riots following the arrival at the Greyhound Bus Station on Saturday, May 20th, of three groups of so-called "Freedom Riders." A race riot occurred on Sunday night in the vicinity of the church of which the appellant Abernathy was the pastor, in which riot several thousand persons participated. Some of these appellants, including Abernathy, were at the church during the riot. The racial situation in the city was extremely tense. Some fourteen hundred national guardsmen were on duty. The streets were being patrolled by armed convoys.

The first groups of Freedom Riders had been given a police escort to the Mississippi state line on the morning of the day this additional group, composed of seven of these appellants, arrived at the Greyhound Bus Station. The explosive atmosphere was heightened by their arrival, at a time when it was considered the city had passed its crisis. This group was met at the station by a hostile crowd of some two thousand persons. The crowd was unruly and bricks and stones were hurled at the auto-

mobile in which these persons were driven from the bus station.

The next morning a military convoy, under the command of Colonel Poarch of the Alabama National Guard, escorted the appellants from the home of appellant Abernathy to the Trailways Bus Terminal. This escort had been arranged by General Graham, who had asked appellants to contact his office when they desired to travel. The convoy proceeded directly from Abernathy's house to the bus station. Upon entering the station they went directly to the ticket window and some of them bought tickets to Jackson, Mississippi. From there they went to the lunch counter in the front portion of the room and began to occupy the seats at the counter.

The State's testimony tended to show that at this time some thirty persons were milling around inside the station, eighteen or more besides the appellants and the law enforcement officers; four or five hundred people were outside in the immediate vicinity of the station, and over a hundred law enforcement officers were stationed outside. In the front part of the station there were large plate glass windows and it was possible for the crowd outside to see inside the station; that when the appellants sat down at the lunch counter an outburst of noise was heard from the crowd outside. At this time Colonel Poarch directed the Sheriff of Montgomery County to arrest the defendants. Colonel Poarch testified he gave the arrest order because the air was electric with excitement and tension; that the crowd outside was hostile to these persons; that there was also a number of people in the station that could have caused trouble or injury, not only to the defendants themselves, but also to innocent passersby or people who had no connection with either side of the trouble, as well as to the National Guardsmen, and it was his opinion the conduct of the defendants under the circumstances was calculated to provoke a breach of the peace.

For the defendants, William S. Coffin, Jr., Chaplain of Yale University, testified he first learned of racial violence in Montgomery from appellant MacGuire on May 21, 1961. As a result of such information and a sermon he had preached, he along with four other appellants, MacGuire, Noyce, Smith and Swift, three of whom are white men and one a Negro decided to come to Montgomery. They flew to Atlanta and were joined there for the bus trip to Montgomery by appellants Carter and Jones, who are Negroes. They spent the night in Montgomery and the seven travelers decided to proceed to Jackson, Mississippi. Appellant Shuttlesworth, Lee, Abernathy and Walker, Negroes, accompanied them to the bus terminal. They were provided heavy military escort to the terminal. Upon arrival at the station they were ushered into the white waiting room and they went directly to the ticket window and seven of the appellants purchased tickets to Jackson, Mississippi. Shortly after leaving the ticket window they seated themselves at the lunch counter and ordered and were served coffee. At this point they were placed under arrest by the sheriff. They were given no warning that they were not to sit at the counter. That it was not possible to see persons in the lunchroom from outside through the tinted glass windows; that when he left Abernathy's house it was his intention to seek service at the terminal on a racially integrated basis.

Donald Martin, Alabama News Manager, United Press International, testified that on the day previous to appellant's arrest a racially mixed group used the facilities of the white waiting room at the Trailways Bus Terminal. There were no incidents and they were not arrested. At that time there was a crowd of approximately two hundred fifty to three hundred fifty persons on streets surrounding the bus terminal; that it was not possible to discern the race of persons at the lunch counter when looking through the glass from outside; that he was not in the terminal on the day appellants were arrested.

General Henry Graham, Adjutant General of Alabama, was called as a witness by the defendants. He testified he was present when the defendants were arrested. He was asked if he had occasion to make public comment on the arrests shortly after they were made. The court sustained the State's objection to any statement he may have made after the arrest, on the ground the defendant could not be allowed to impeach his own witness.

The witness testified that on May 24th, he was in charge of the military situation in Montgomery; that on that day two bus loads of passengers elected to leave for Jackson, Mississippi, and military escort was provided for the buses to the Mississippi State line; that he read in the newspapers that the passengers ate in racially mixed groups at the lunch counter before boarding their buses, but that he was not in the bus station at the time and he accompanied the first bus load; that no traveler had been arrested until these defendants were arrested; that he first heard these defendants were enroute to Montgomery from Atlanta when he was at the Mississippi line and he turned the military party back to Montgomery rather rapidly and some of the force reached Montgomery at the same time these seven travelers arrived there from Atlanta; that he was present in the bus terminal the next morning when these defendants were arrested; that he was provoked, was irritated and was angry because of the danger in which this incident had placed his men and the people of the community, but they were not arrested because he was angry, and it was not anger that led to his changing his method of dealing with the Freedom Riders; that whether he would have ordered the arrest of the first travelers who ate as a racially mixed group if he had been present would have depended upon the situation at that particular time; that he had made the statement that these defendants wanted to be arrested and "we have accommodated them."

The prosecutions were begun in the Common Pleas Court by affidavit. The affidavit charged that this defendant, on or about May 25, 1961, "did disturb the peace of others by violent, profane, indecent, offensive or boisterous conduct or language or by conduct calculated to provoke a breach of the peace in that he did come into Montgomery, Alabama, which was subject to martial rule and did wilfully and intentionally attempt to test segregation laws and customs by seeking service at a public lunch counter with a racially mixed group, during a period when it was necessary for his own safety for him to be protected by military and police personnel and when the said lunch counter building was surrounded by a large number of hostile citizens of Montgomery.

"COUNT II

"Ralph D. Abernathy did meet with two or more persons to commit a breach of the peace or to do an unlawful act, against the peace and dignity of the State of Alabama."

In the circuit court Count I of the complaint filed by the solicitor charged that defendant, "did disturb the peace of others in Montgomery, Alabama, at a time when said city and county were under martial rule as a result of the outbreak of racial mob action, by conduct calculated to provoke a breach of the peace, in that he did wilfully and intentionally seek or attempt to seek service at a public lunch counter with a racially mixed group, at which time and place the building housing said lunch counter was surrounded by a large number of hostile citizens of Montgomery, Alabama, and it was necessary for his own safety for him to be protected by military and civil police personnel; * * *."

Count II of said complaint charged that defendant "did meet with two or more persons to commit a breach of the peace or to do an unlawful act, in that he did meet with two or more persons in Montgomery, Alabama, at a time when said city and county were under martial rule as a result of the outbreak of racial mob action, for the purpose of wilfully and intentionally seeking or attempting to seek service at a public

lunch counter with a racially mixed group at which time and place the building housing said lunch counter was surrounded by a large number of hostile citizens of Montgomery, Alabama, and it was necessary for his own safety for him to be protected by military and police personnel * * *."

The defendant filed a motion to quash the affidavit, warrant and complaint on the grounds that by the issuance of the affidavit and complaint the defendant was denied the rights guaranteed to him by the Fourteenth Amendment to the Constitution of the United States, and Article 1 Section 6 of the Constitution of Alabama 1901, in that he was deprived of freedom of speech, religion, travel and association; his arrest was designed to perpetrate racial segregation and was thus a denial of equal protection of law and that the charges against him were so vague as to amount to a denial of due process of law. The defendant further alleged that he was deprived of the right of unsegregated use of travel facilities guaranteed by the Interstate Commerce Act (part II, Sec. 216(d), Title 49 U.S.C.A. § 316(d) and that an imposition of racial segregation on interstate travelers is an undue burden on interstate commerce in violation of Article I, § 8 of the Constitution of the United States. The court overruled the motion to quash.

The defendant then interposed a demurrer to the affidavit, warrant and complaint. The demurrer raised all the objections made under the motion to quash and further averred that the allegations of the affidavit, warrant and complaint, and the statutes upon which they are based, are so vague, indefinite and uncertain as not to apprise the defendant of the nature and cause of the accusation against him; that no offense is alleged; that the complaint was drawn in the alternative and that there was a fatal variance between the affidavit and complaint. The demurrer was overruled.

After the presentation of the state's case, and before putting on his defense, the defendant moved to exclude the state's evidence on the grounds that to convict him under the evidence adduced would deprive him of his constitutional rights of due process of law. The motion to exclude was denied.

Sections 232 and 236 of Title 15, Code of Alabama 1940, provide:

"232. The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment; * * *."

"236. Where a statute creating or defining an offense uses special or particular terms, an indictment on it may use the general term which, in common language, embraces the special term."

In Nailer v. State, 18 Ala.App. 127, 90 So. 131, the court said:

"This complaint when filed becomes the charge against the defendant, based, of course, upon the original affidavit. * * * The plea or demurrer of defendant is to the complaint as filed by the solicitor, and not to the original affidavit, unless the original affidavit is void and charges no offense, in which event the motion should be to quash."

■ The solicitor's complaint was framed in the language of Sections 119(1) and 407 of Title 14, Code, the statutes which define the offenses, and specifies the particular conduct alleged as constituting the offense with sufficient clearness to apprise the defendant of the charge against him and to enable the court to pronounce the proper judgment. See Mitchell v. State, 41 Ala. App. 254, 130 So.2d 198.

■ We are of the opinion the affidavit here was not void, but that it was sufficient to authorize the issuance of the warrant and furnished sufficient foundation for a prosecution to conviction upon the solicitor's

complaint. Miles v. State, 94 Ala. 106, 11 So. 403.

It is provided by Section 247, Title 15, Code 1940 that, "when the offense may be committed by different means * * * such means * * * may be alleged in the same count in the alternative."

■ We find no merit in the defendant's contention that there was a fatal variance between the affidavit and the complaint in that the affidavit alleged in the alternative that defendant disturbed the peace of others "by violent, profane, indecent, offensive or boisterous conduct or language or conduct calculated to provoke a breach of the peace," while the complaint only charged a disturbance of the peace "by conduct calculated to provoke a breach of the peace."

■ We are further of the opinion that the statutes creating the offenses of unlawful assembly, Sec. 407, Title 14, and breach of the peace, Sec. 119(1), Title 14, Code, supra do not, either in themselves or as construed and applied to this defendant, abridge the right of free speech and assembly guaranteed by the First Amendment to the Constitution of the United States, nor has he been denied the equal protection of the law guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article 1, Section 6, Constitution of Alabama.

The motion to quash the demurrer, and the motion to exclude the evidence were properly overruled.

■ There was no error in the court's refusal to allow the defendant to cross-examine General Graham, or in refusing to allow the introduction of a transcript of his testimony in a previous case in another court. A party cannot impeach or discredit his own witness by introducing proof of prior inconsistent statements. Woods v. State, 38 Ala.App. 582, 90 So.2d 92; Ruffin v. State, 30 Ala.App. 344, 6 So.2d 455; Duncan v. State, 20 Ala.App. 209, 101 So. 472.

"An unlawful assembly is an assembly of three or more persons, (Our statute has reduced the minimum number of participants to two.) who, with intent to carry out any common purpose, assemble in such a manner, or so conduct themselves when assembled, as to cause persons in the neighborhood of such assembly to fear on reasonable grounds that the persons so assembled would commit a breach of the peace or provoke others to do so." 2 Wharton's Criminal Law, Sec. 853, p. 721; Shields v. State, 187 Wis. 448, 204 N.W. 486, 40 A.L.R. 945; Aron v. Wausau, 98 Wis. 592, 74 N.W. 354, 40 L.R.A. 733.

"In general terms a breach of the peace is a violation of public order, a disturbance of the public tranquillity, by any act or conduct inciting to violence or tending to provoke or excite others to break the peace." Shields v. State, supra. 8 Jur. Sec. 3 p. 834.

The appellant urges that the evidence was insufficient to support a conviction for the failure of the state to prove criminal intent; to prove that appellant's conduct did in fact provoke or threaten to provoke a breach of the peace; to prove that appellant's conduct was "violent, profane, indecent, offensive or boisterous;" to prove that appellants had knowledge their acts would or might provoke others to a breach of the peace.

■ No specific intent to breach the peace is essential to a conviction for a breach of the peace. State v. Cantwell, 126 Conn. 1, 8 A.2d 533; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L. Ed. 1213, 128 A.L.R. 1352. Nor is it necessary to constitute the offense of a breach of the peace that the proof show the peace has actually been broken. People v. Kovalchuck, Co.Ct., 68 N.Y.S.2d 165; People v. Ripke, Co.Ct., 115 N.Y.S.2d 590.

■ The solicitor's complaint became the charge in the circuit court. There was no

averment that the conduct of appellant was "violent, profane, indecent, offensive, or boisterous," and without such averment proof of such fact was not required.

■ The question of whether certain conduct constitutes a breach of the peace depends largely upon the facts of each particular case and the circumstances surrounding the incident. An act which would be lawful in some circumstances may amount to a breach of the peace if done under other circumstances.

■ The incident occurred during a period of great public excitement. The evidence shows that this defendant was aware of the tenseness of the situation and the temper of the crowd. We think it could not conceivably be said that he did not have knowledge that his conduct was calculated to incite a breach of the peace.

■ The judgment of the court in an action tried without a jury is entitled to the same weight as the verdict of a jury, and will not be disturbed on appeal unless plainly contrary to the great weight of the evidence. 6 Ala.Dig. Criminal Law ⚖260 (11). Under the facts and circumstances adduced we think the question of whether the defendant's conduct was reasonably calculated to provoke a breach of the peace was one for the trier of fact. The evidence was sufficient to sustain the judgment of the trial court.

Affirmed.

CATES, Judge (dissenting).

I must respectfully dissent because, to me, at the trial below, the State did not prove beyond a reasonable doubt that there was a clear and imminent danger of a breach of the peace.

These defendants came to the bus station in protective custody of the militia, i. e., voluntarily escorted for their own safety. To say that as interstate travelers they had a "right" to eat black and white side by side at the bus station lunch counter, may not be a precise statement. Under Boynton v. Virginia, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206, the federal courts call it "unjust discrimination" not to let them so eat.

Has a State a duty to protect a person in the doing of an act which it may not restrain?

As I read the evidence [1] there was not proof beyond a reasonable doubt that *the sitting down at the lunch counter* caused the crowd to gather at the bus station. Nor was there any evidence of even so much as an assault (in legal parlance) at a militiaman. See Ellis v. Pratt City, 113 Ala. 541, 21 So. 206.

Holmes said no one has a right to yell "Fire" in a crowded theatre. I fail to see that what the defendants did here was that reckless. There may have been a lighted match, but was there—beyond a reasonable doubt—an open powder keg?

[1] I am not unmindful of the various witnesses testifying as to "tension," "electric atmosphere" and "noise" from the crowd. These to me are subjective expressions under the elements of the offense charged. The evidence shows no overt act manifesting the potentiality of the crowd nor the capability of the militia for force and arms.